BEASLEY *v.* CUNNINGHAM.

(*Nashville,* December Term, 1936.)

Opinion filed March 27, 1937.

Seay, Stockell & Edwards, of Nashville, J. D. Mc-Murray, of Hartsville, and I. D. Beasley, of Carthage, for plaintiff in error.

Roberts & Roberts, of Nashville, J. D. Hankins, of Hartsville, and H. B. McGinness, of Carthage, for defendant in error.

Mr. Justice McKinney delivered the opinion of the Court.

This is a contest over the office of county superintendent of roads in Trousdale county. In the August, 1936, election, Beasley received 453 and Cunningham 564 votes, a majority of 111.

By this proceeding Beasley, as holdover, is contesting Cunningham's right to the office, upon the sole ground that he is ineligible to hold said office by virtue of section 2, chapter 92, Private Acts of 1935, First Extra Session. Cunningham contends that this provision of the act is invalid and void.

By chapter 27, Private Acts of 1935, the office of county road commissioner for Trousdale county was abolished, and defendant thereby legislated out of the office which he had filled for four years pursuant to chapter 106, Private Acts of 1931. By chapter 31, Private Acts of 1935, a new road law was enacted for Trousdale county, which became effective on January 24, 1935. By section 1 of said act a board of highway commissioners was created composed of the chairman of the county

court, the county superintendent of roads to be created, and a third member to be elected by the county court. The act provides that the members of this board shall be citizens of good character, freeholders of said county, and over the age of twenty-one years.

Section 2 of said act creates the office of county superintendent of roads, fixes the term at four years, and designates petitioner, Beasley, to fill the office until the regular election in August, 1936, and until his successor is elected and qualified. Beasley thereupon duly qualified and took over the office.

Immediately after the passage of the act just referred to defendant Cunningham, possessing the qualifications named in the act, announced his candidacy for said office in the August, 1936, election. Thereafter, at the First Extra Session in July, 1935, the Legislature, by chapter 92 of the Private Acts, re-enacted chapter 31 of the Private Acts of the regular 1935 session, to which was added a qualification for the office of county superintendent of roads that would render Cunningham ineligible for election in August, 1936. Section 2 of said act, as thus amended, is as follows:

"That there is hereby created the office of County Superintendent of Roads who shall be elected by the qualified voters of the Counties coming within the provisions of this Act, who shall hold his office for a period of four years and until his successor is elected and qualified, but the first County Superintendent of Roads shall be Walter J. (Bud) Beasley, who shall hold until the regular August Election of 1936 and until his successor is elected and qualified and his successor's term of office shall begin on the first Monday in September after said election; *Provided, that no person shall be eligible to*

*election to the office of County Superintendent of Roads,
or to the office of member of the Board of Highway Com-
mission, at the August election 1936, who has served as
County Road Commissioner of said County for as long
as four years in the eight year period preceding the date
of said election;* and provided further that no person
hereafter elected to either of said offices shall be eligible
to be elected or to serve for more than two successive
terms. The County Superintendent of Roads shall de-
vote his entire time to the duties of his office and shall
receive a salary of $100.00 a month for his services and
shall furnish his own means of conveyance while attend-
ing to the duties of the office, but may use gasoline and
oil belonging to the county while actually attending to
the duties of his office.'' (Italics ours.)

It is conceded that the qualification which we have
italicized applies solely to Cunningham, and then only
at the August, 1936, election; that it can never apply
to any other person, and will not preclude Cunningham
from filling said office by appointment, in case of the
death or resignation of the incumbent, or by the will of
the electorate at some subsequent election. The Legis-
lature has said, in effect, that Jim Tom Cunningham is
not eligible to be elected to said office at the 1936 elec-
tion, but may be chosen for the office thereafter. Can
the Legislature thus single out an individual and inhibit
him from filling an elective public office for a single spec-
ified term, is the question which we are called upon to
determine.

██ ██ Under our system of government the Legisla-
ture, unless restrained by the Constitution of the State
or that of the United States, can pass any law it sees fit.
*Motlow v. State*, 125 Tenn., 547, 145 S. W., 177, 189, L[

R. A. 1916F, 177. The restraint must be either express or by necessary and fair implication. *Prescott* v. *Duncan,* 126 Tenn., 106, 148 S. W., 229; *Smiddy* v. *City of Memphis,* 140 Tenn., 97, 203 S. W., 512; *Bank of Commerce & Trust Co.* v. *Senter,* 149 Tenn., 569, 260 S. W., 144. A law which is partial in its operation, intended to effect particular individuals alone, is unwarranted by the Constitution and is void. *Vanzant* v. *Waddel,* 10 Tenn. (2 Yerg.), 260; *State Bank* v. *Cooper,* 10 Tenn. (2 Yerg.), 599, 24 Am. Dec., 517; *Parks* v. *Parks,* 59 Tenn. (12 Heisk.), 633; *Daly* v. *State,* 81 Tenn. (13 Lea), 228. In *Motlow* v. *State, supra,* this court, in considering the constitutional provisions prohibiting arbitrary and unreasonable classification, said: "These provisions forbid that any mere individual shall be singled out for legislative action, but do not deny the right to the lawmaking power to make proper classifications for purposes of legislation." In *Fountain Park Co.* v. *Hensler,* 199 Ind., 95, 155 N. E., 465, 468, 50 A. L. R., 1518, the Supreme Court of Indiana, in holding an act unconstitutional which conferred the power of eminent domain upon Chautauqua corporations to enable them to condemn private property for their meeting places, said:

"It may not be impossible for companies other than appellant to come within the classification made in this act, but it is improbable that there will ever be many, if any at all, that can come within its narrowed and limited provisions. The legislative history of the act, Indiana House Journal, 1923 Session, p. 297, shows that the bill for the act was introduced by the representative from the county in which the appellant company is located; this action was begun within a few months after the law was enacted, and it is quite apparent that the

act was intended by its author and by the General Assembly which enacted it to apply to this one corporation alone. This would invalidate the act. *School City of Rushville* v. *Hayes,* 162 Ind., 193, 70 N. E., 134; *Rosencranz* v. *Evansville* [194 Ind., 499, 143 N. E., 593]."

In *State ex rel. Brassell* v. *Teasley, Judge,* 194 Ala., 574, 69 So., 723, 730, Ann. Cas., 1918E., 347, the Supreme Court in a four to three opinion held an act valid which provided: "No person shall be eligible to the office of president or member of the board of commissioners . . . who shall, either by election or appointment, have held the office of president or member of the board of commissioners of any such city, three consecutive years, within the four years immediately preceding the date of the election for members of the board of commissioners." Gen. Acts, Ala., 1915, p. 65, sec. 11.

We shall refer more particularly to this case later, but as bearing upon the question of a law intended to affect particular individuals alone, we quote from the dissenting opinion of Judge Mayfield as follows:

"I do not doubt, much less deny, the power of the Legislature to fix any reasonable qualifications upon the privilege of holding office, and to deny the privilege to any citizen who does not possess the qualifications so fixed; but I do deny the power of the Legislature to take arbitrarily from certain individuals privileges enjoyed by others of the same class. I do not believe that an act of the Legislature, attempting so to do, is made valid by a classification of the citizens which did not then, never did, and never can, apply to any other citizens than those intended to be discriminated against. Such I believe is the effect, if not the purpose, of the provisions of the act in question. Experience may demonstrate

fitness or unfitness to discharge given official, or non-official, duties; but it certainly does not tend to disqualify one for the discharge of duties which he is accustomed to discharge, nor can it be for the public good to deny the right to those who have experience; and this is the only thing that distinguishes these four incumbents from other citizens qualified to be elected to office. This is both an unwarranted and unreasonable classification.

"The qualification for holding office must be a reasonable one; it cannot be an arbitrary or an unreasonable one."

In 6 R. C. L., 370, 371, it is said: "No legislative act is valid that is clearly obnoxious to the principle of equality in rights guaranteed by the bill of rights."

We have been unable to find a decision sustaining an act of the Legislature that only applies to a single individual. The qualification for county superintendent of roads, which we are considering, is retroactive in character, and punishes defendant for having filled another public office. No satisfactory reason occurs to us as to why defendant should be considered eligible for this office at any and all times, except at the August, 1936, election. We conclude, therefore, that this provision of the act is arbitrary and unreasonable.

We are further of the opinion that the Legislature in disqualifying defendant from being elected to the office of county superintendent of roads in the August, 1936, election deprived him of a privilege guaranteed to him by article 1, section 8, of the Constitution, which is as follows:

"That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or out-

lawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land.''

The only difference between this section and that contained in the Constitution of 1834 is that in the latter the word ''free'' was prefixed to the word ''man.''

In *Jones' Heirs* v. *Perry,* 18 Tenn. (10 Yerg.), 59, 30 Am. Dec., 430, the court, speaking through Judge Green, in holding an act invalid which authorized named guardians to sell the lands of their wards to pay the debts of their ancestors, said:

''By this court, in many cases these terms 'law of the land,' are defined to mean a general and public law, operating equally upon every member of the community.

''It is however contended, that this provision of the constitution was not intended to apply to a case like the present, but was intended to prevent majorities in times of high political excitement from passing partial laws, whereby to create forfeitures of estates and otherwise to destroy obnoxious individuals. It is true, no doubt, but that the primary object of the framers of the constitution was to protect individuals in cases like those suggested in the argument. But the language used is of general application and forbids the enactment of a partial law, by which the rights of any individual shall be abridged or taken away. Nor is there a single provision in our constitution more salutary in its character, or that demands in its enforcement the exercise of greater vigilance and energy.''

Judge Cooley, speaking for the Supreme Court of Michigan in *People* v. *Hurlbut,* 24 Mich., 44, 9 Am. Rep., 103, after observing that some things were too plain to be written, said: ''Mr. Justice Story has well shown

that constitutional freedom means something more than liberty permitted; it consists in the civil and political rights which are absolutely guarantied, assured and guarded; in one's liberties as a man and a citizen—his right to vote, his right to hold office, his right to worship God according to the dictates of his own conscience, his equality with all others who are his fellow-citizens; all these guarded and protected, and not held at the mercy and discretion of any one man or of any popular majority.—Story, Miscellaneous Writings, 620."

In *State* v. *Wm. Staten,* 46 Tenn. (6 Cold.), 233, 243, in considering the kindred privilege of voting in elections, the court said:

"The elective franchise is a right which the law protects and enforces as jealously as it does property in chattels or lands. It matters not by what name it is designated—the right to vote, the elective franchise, or the privilege of the elective franchise—the person who, under the Constitution and laws of the State, is entitled to it, has a property in it, which the law maintains and vindicates, as vigorously as it does any right of any kind which men may have and enjoy."

And on pages 280, 281, it was further stated: "The right of suffrage is a privilege; it is a right; one that is regarded by our race of people as more valuable than any other right with which he is invested; it is regarded as more valuable than property, for by it he guards and protects his life, liberty and property; when clothed with the right, he has a vested interest, of which he cannot be deprived by any act of the Legislature. It can only be taken by due process of law, or by the will of the people, acting in their sovereign character. It is a right secured to the citizen, under the Constitution of the State."

In *Lonas* v. *State,* 50 Tenn. (3 Heisk.), 287, 307, it was said: " 'These privileges and immunities,' said Washington, J., 'may be all comprehended under the following general heads: protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind and to pursue and obtain happiness and safety; *subject, nevertheless, to such restraints as the government may justly prescribe for the general good of the whole.*

" 'The right of the citizen of one State to pass through or reside in any other State, for purposes of trade, agriculture, professional pursuits or otherwise; to claim the benefit of the writ of *habeas corpus;* to institute and maintain actions of every kind in the courts of the State; to take, hold and dispose of property, both real and personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the State; to which may be added the elective franchise, as regulated and established by the laws and Constitution of the State in which it is to be exercised.' *Corfield* v. *Coryell* [Fed. Cas. No. 3,230], 4 Wash. C. C., 380. These are some of the privileges and immunities intended to be guaranteed to the citizen, 'subject,' says the learned Judge, 'to such restraints as the government may justly prescribe for the general good of the whole.' There are many others not herein enumerated, and upon which the courts will decide as the cases arise: *Conner* v. *Elliott,* 18 How., 591 [15 L. Ed., 497]."

The right to exercise a public office is a species of property. *Malone* v. *Williams,* 118 Tenn., 390, 391, 103 S. W., 798, 121 Am. St. Rep., 1002; *Mayor, etc., of Memphis* v. *Woodward,* 59 Tenn. (12 Heisk.), 499, 27 Am. Rep., 750.

The Supreme Court of the United States, in *Cummings* v. *Missouri,* 71 U. S. (4 Wall.), 277, 321, 18 L. Ed., 356, said:

"The theory upon which our political institutions rest is, that all men have certain inalienable rights—that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment, and can be in no otherwise defined.

"Punishment not being, therefore, restricted, as contended by counsel, to the deprivation of life, liberty, or property, but also embracing deprivation or suspension of political or civil rights, and the disabilities prescribed by the provisions of the Missouri constitution being in effect punishment, we proceed to consider whether there is any inhibition in the Constitution of the United States against their enforcement."

In the Alabama case, referred to above and relied upon by complainant, we quote from the majority opinion as follows:

"The matter of being a candidate for a municipal office is not a vested right. It is a privilege only, that may be affected by prescribing qualifications for eligibility to hold the municipal office. Aptly pertinent, by way of perfect analogy, to this matter, it was said in *Washington's Case* [*Washington* v. *State*], 75 Ala. [582], 584, 51 Am. Rep., 479, after pointing out that the ballot was a privilege only, not an 'absolute or natural right' (thus distinguishing, as was therein done, *Ex parte Garland* [4 Wall., 333, 18 L. Ed., 366], and *Cummings* v. *Missouri*

[4 Wall., 277, 18 L. Ed., 356]) : 'It is well settled, therefore, under our form of government, that the right (to vote) is one conferred by Constitutions and statutes, and is the subject of exclusive regulation by the state, limited only by the provisions of the fifteenth amendment to the Federal Constitution, which prohibits any discrimination on account of ''race, color, or previous condition of servitude.'' . . . The states having the power to confer or to withhold the right, in such manner as the people may deem best for their welfare, it necessarily follows that they may confer it upon such conditions or qualifications as they may see fit, subject only to the limitation above mentioned.'

''This being true as to the privilege of the ballot, and the matter of candidacy for municipal office certainly occupying no higher sanctity or dignity, and the Constitution not prescribing or containing any exclusive limitation applicable to this municipal office, it is obvious that the Legislature has a discretion, in respect of qualifications for municipal office, which section 11 of the act under review does not offend.''

It will be noted that the court places the ballot and running for office in the same class, which it designates as privileges as distinguished from vested rights; while in this state this court has said that the elective franchise is a privilege protected by the constitution. The Constitution of Alabama contains no provision prohibiting a citizen from being disseized of his privileges. Had the Constitution of that state contained a prohibition similar to that incorporated in article 1, section 8, of our Constitution, the result would probably have been different.

It will also be noted in the Alabama case that the

amendatory act involved provided that neither the president nor members of the board of commissioners should succeed themselves, a more reasonable qualification than the one prescribed in the case under consideration. The principal controversy in the Alabama case, however, involved the constitutionality of the amendatory act upon the ground that it was in the nature of an *ex post facto* or a retroactive law.

In this case the Legislature created a new office, to be filled by a freeholder of good character over twenty-one years of age. The act was then amended so as to provide that defendant could not be elected to the office at the 1936 election. This was an arbitrary and unreasonable discrimination that deprived the defendant of a constitutional privilege and was therefore invalid.

It follows that the decree of the circuit court will be reversed and the bill dismissed.