IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 11, 2000 Session

# MARK A. MAYHEW, ET AL. v. HON. JOHN WILDER, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 00C1833     Hamilton V. Gayden, Jr., Judge**

---

**No. M2000-01948-COA-R10-CV - Filed January 11, 2001**

---

A citizen of the state, later joined by three Nashville newspapers, filed this action alleging that Tennessee's fiscal year 2000-2001 budget and revenue bills are void because they resulted from secret meetings in both houses of the General Assembly. The Tennessee Press Association, the Middle Tennessee Chapter of the Society of Professional Journalists, the Tennessee Associated Press Managing Editors and thirteen newspapers were allowed to intervene to challenge the General Assembly's right to meet in closed sessions, but they did not seek to have the budget and revenue bills declared void. The complaint and amended complaints sought declaratory and injunctive relief against various state officials, alleging that any secret meeting of the General Assembly violates the Tennessee Constitution, the United States Constitution, and the State Open Meetings Act. The defendants moved to dismiss, raising the defenses of standing, soverign immunity, separation of powers, and failure to state a claim. The Circuit Court of Davidson County overruled the motion to dismiss, and we granted the defendant's application for an extraordinary appeal under Rule 10, Tenn. R. App. Proc. We find that the Open Meetings Act does not apply to the General Assembly, that the plaintiffs have not stated a claim under either the Tennessee or United States Constitutions, and that the question of when to close legislative meetings is non-justiciable because our Constitution commits that question exclusively to the General Assembly. We, therefore, reverse the lower court's order and dismiss the complaint.

**Tenn. R. App. P. 10 Appeal by Permission; Judgment of the Circuit Court**
**Reversed and Dismissed**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, JJ., joined. WILLIAM C. KOCH, JR., J., concurring.

Paul G. Summers, Attorney General and Reporter, Andy D. Bennett, Chief Deputy Attorney General, Michael E. Moore, Solicitor General, Michael W. Catalano, Associate Solicitor General, Ann Louise Vix, Senior Counsel, for the appellants, Hon. John Wilder, Jimmy Naifeh, Paul Summers, Steve Adams, John Morgan and the Tennessee General Assembly, individually and as a body in their official capacity as members of the Senate and the House of Representatives.

George E. Barrett, Douglas S. Johnston, Edmund L. Carey, Jr., James G. Stranch, III, and C. Dewey Branstetter, Jr.,Nashville, Tennessee, for the appellees, Mark A. Mayhew, individually, and on behalf of all the citizens of the State of Tennessee, the *Nashville Scene*, *NashvillePost.com*, and Lyle Media, Inc., d/b/a *In Review*.

Alfred H. Knight and Alan D. Johnson, Nashville, Tennessee, for the appellees, *The Tennessean, The Jackson Sun, The Knoxville News-Sentinel, Chattanooga Times/Chattanooga Free Press*, the *Daily News Journal* (Rutherford County), the *Greenville Sun*, the *Newport Plain Talk*, the *Daily Post-Athenian*, *Rogersville Review*, the *News-Herald* (Louden County), the *Herald-News* (Rhea County), *Monroe County Advocate*, the Society of Professional Journalists, Middle Tennessee Chapter and Tennessee Associated Press Managing Editors.

Lucian T. Pera, Memphis, Tennessee, for the appellee, Memphis Publishing Company, d/b/a *The Commercial Appeal.*

Richard L. Hollow and Nathan D. Rowell, Knoxville, Tennessee, for the appellee, Tennessee Press Association.

Rob Briley, Nashville, Tennessee, Amicus Curiae, Pro Se.

Susan L. Kay, Nashville, Tennessee, for Amicus Curiae Tennessee Chapter, American Civil Liberties Union.

**OPINION**

**I.**

After a contentious and protracted legislative session, the Tennessee General Assembly finally passed a budget for fiscal year 2000-2001, HB 2790/SB 2977, and a revenue bill to fund it, HB 3364/SB 3351. On June 30, 2000, one day before the bills were to take effect, an individual citizen sued the Speaker of the House of Representatives, the Speaker of the Senate, and all the other members of the General Assembly alleging that in deliberating the budget and revenue bills toward passage, both legislative houses, and separate and joint committees thereof, repeatedly held sessions that were closed to the public and to the press. The complaint alleged that such secret meetings violated Article II, Section 22 of the Tennessee Constitution, Tenn. Code Ann. § 8- 44-101, et seq., and the due process provisions of the Fourteenth Amendment to the United States Constitution.

The plaintiff sought (1) a declaration that the budget and revenue bills are void and of no effect, (2) an injunction prohibiting the General Assembly from further violations of the Open Meetings Act, and (3) an imposition of the supplementary remedies provided by statute for a violation of the Open Meetings Act.

On July 10, 2000, the plaintiff filed an amended complaint adding the *Nashville Scene*, a weekly newspaper, as a plaintiff and the Attorney General, Comptroller, and Treasurer as defendants. The next day, the plaintiffs filed a motion for leave to file a second amended complaint adding as plaintiffs two other newspapers, the *Nashville Post.com* and Lyle Media, Inc., d/b/a *In Review*. Additionally, the motion asked the court to realign Representative Rob Briley as a plaintiff for the limited purpose of obtaining a declaration of the court as to whether the Open Meetings Act applied to the Legislature. The second amended complaint also asserted that the General Assembly's secret meetings violated Article I, Section 19 of the Tennessee Constitution and the First Amendment to the United States Constitution.

The trial court granted the plaintiffs' motion to file the second amended complaint and to dismiss Representative Briley as a defendant and to add him to the list of plaintiffs. Subsequently, the court, sua sponte, held that Representative Briley could not be a party to the action but could remain in the case in his official capacity as an amicus. The Tennessee Press Association, the Middle Tennessee Chapter of the Society of Professional Journalists, the Tennessee Associated Press Managing Editors and a group of thirteen newspapers intervened as plaintiffs, but they did not seek to have the budget and revenue bills declared void.

On July 24, 2000, the defendants filed a motion to dismiss on the following grounds:

(1) that the plaintiffs lacked standing to bring the lawsuit under the Open Meetings Act or either the Tennessee or United States Constitution;
(2) that the plaintiffs' claims under the Open Meetings Act, Article II, Section 22, and Article I, Section 19 of the Tennessee Constitution are non-justiciable;
(3) that the remedies sought are not available for violations of the Open Meetings Act or the Tennessee Constitution;
(4) that the complaints did not state a claim under the First and Fourteenth Amendments to the United States Constitution;
(5) that the claims for injunctive relief were barred by legislative immunity;
(6) that the complaints did not allege that house and senate journals showed that the budget and revenue acts were passed in violation of the constitutional requirements.

On August 10, 2000, the court overruled the motion to dismiss and notified the parties that the court was contemplating appointing a constitutional law expert to advise the court about the remedies available if the court found a violation of either the Open Meetings Act or of the state or federal constitutions.

We granted the State's Rule 10, Tenn. R. App. P., application for permission to appeal.

**II.**

This court is not often asked to decide questions about the fundamental structure of our state government. Inevitably, however, the constitutional provisions regarding the separation of powers

and the constitutional and common law immunities of various public officials require the courts to locate the boundaries of executive, legislative, and judicial power. Thus, the fundamental questions we must answer are (1) under what circumstances the General Assembly, legislative committees and subcommittees, and other groups of legislators may meet in secret, and (2) what part the courts play in reviewing the decision to hold secret sessions.

### III.
#### STANDING

First we must address the issue of standing, a judge-made doctrine based on the idea that "[a] court may and properly should refuse to entertain an action at the instance of one whose rights have not been invaded or infringed." 59 Am. Jur. 2d *Parties* § 30 (1987). In state law it parallels the constitutional restriction on federal court jurisdiction to "cases and controversies." U.S. Const. art. 3, § 2. It has been said that no case or controversy is presented where the plaintiff lacks standing to sue. *Gilligan v. Morgan*, 413 U.S. 1 (1973); *see also O'Shea v. Littleton, 414 U.S.* 488 (1974). "In determining whether the plaintiff has a personal stake sufficient to confer standing, the focus should be on whether the complaining party has alleged an injury in fact, economic or otherwise, which distinguishes that party, in relation to the alleged violations, from the undifferentiated mass of the public." 32 Am. Jur. 2d *Federal Courts* § 676 (1995).

In Tennessee, the standing doctrine requires that the person challenging the constitutionality of a statute "must show that he personally has sustained or is in immediate danger of sustaining, some direct injury . . . and not merely that he suffers in some indefinite way in common with people generally." *Parks v. Alexander*, 608 S.W.2d 881, 885 (Tenn. Ct. App. 1980). The mere status as a taxpayer or voter is not enough. *Id.* The plaintiff must allege that the effect of the statute will impose burdens on him "not common to the body of the citizens." *Patton v. Chattanooga*, 65 S.W. 414 (Tenn. 1901); *Bennett v. Stutts*, 521 S.W.2d 575 (Tenn. 1975); *Sachs v. Shelby County Election Commission*, 525 S.W.2d 672 (Tenn. 1975).

The primary focus of a standing inquiry is on the party, not on the merits of the claims. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484, 102 S.Ct. 752, 765 (1982); *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952 (1968). Thus, a party's standing does not depend on the likelihood of success of its claim on the merits. *MARTA v. Metro. Gov't*, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992). However, because a party's standing may hinge on the nature of its claims, a standing inquiry requires a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 3325 (1984).

Based on these principles, we fail to see how the plaintiffs have alleged facts sufficient to show that they have standing to complain about the effect of the budget and revenue bills. They do not allege that they have sustained any injury not common to the "undifferentiated mass of the public." This conclusion is also true with respect to Representative Briley – although on this record,

he is before the court as an amicus, seeking information only. A legislator does not have a special standing to challenge a statute where the statute does not impede his legislative power. *Korioth v. Briscoe*, 523 F.2d 1271 (5th Cir. 1975).

The plaintiffs, however, are in actuality focused on the process used to pass the two bills. The original plaintiffs' contention that the two bills are void is based on Tenn. Code Ann. § 8-44-105, which declares that any action taken at a meeting in violation of the Open Meetings Act shall be void and of no effect. The three association plaintiffs and the thirteen newspapers seek only a declaration that the Open Meetings Act applies to the General Assembly and that legislative closed meetings violate Article 1, Section 19 of the Tennessee Constitution. Therefore, we will analyze the allegations of the various plaintiffs to determine if they have standing to ask for the relief they seek.

## A. THE ALLEGATIONS

Only *NashvillePost.com* alleges that one of its employees was actually excluded from a closed legislative meeting. The original plaintiff, Mr. Mayhew, the *Nashville Scene* and Lyle Media allege only that legislative committees and other groups of legislators met in secret sessions and that the overt act of excluding one reporter chilled the exercise of rights by other reporters. The complaint filed by the thirteen newspapers, the Society of Professional Journalists and the Tennessee Associated Press Managing Editors simply alleged that legislative committees and groups of legislators had met in secret sessions and that these sessions violated Article I, Section 19 of the Tennessee Constitution and the Sunshine Law (the Open Meetings Act). The Tennessee Press Association does not even allege that the General Assembly met in closed sessions or the legal basis for their claim. They rely on an allegation that because of their role in passing and defending the Sunshine Law, they have more at stake than any other group in Tennessee.

## B. THE ARTICLE I, SECTION 19 CLAIMS

In our opinion only *NashvillePost.com*, the *Nashville Scene* and Lyle Media have alleged facts that give them standing to make the claims under Article I, Section 19 of the Tennessee Constitution. The allegation of *NashvillePost.com* that one of its reporters was actually excluded from a legislative meeting is certainly sufficient to give it standing to make the claim that the closed meeting violated Article I, Section 19 of the Tennessee Constitution. The *Nashville Scene* and Lyle Media allege that their rights were "chilled" by the exclusion of the *NashvillePost.com* reporter. We think this allegation describes a present injury in fact. *See Mohammed v. Pitcher*, 35 F.3d 1081 (6th Cir. 1994). Mr. Mayhew has not alleged that he has suffered an injury distinct from the public at large. He does not allege that he is a member of the media or that the General Assembly's action has prevented him from speaking, writing, or printing on any subject. The thirteen newspapers have not alleged a distinct and palpable injury. They have not alleged that their representatives were excluded from legislative meetings or that their constitutional rights were chilled. Neither the Society of Professional Journalists, the Tennessee Press Association, nor the Tennessee Associated Press Managing Editors have alleged a distinct and palpable violation of their rights as associations.

It is also doubtful that they have standing to assert the constitutional rights of their members. *See Warth v. Seldin*, 422 U.S. 490 (1975); *Sierra Club v. Morton*, 405 U. S.7 27 (1972).

However, since some of the plaintiffs have demonstrated a sufficient personal stake in the outcome of the litigation we will address the merits of the claims that the General Assembly has violated Article I, Section 19 of the Tennessee Constitution.

## C. The Sunshine Law Claims

The standing analysis is quite different under the Sunshine Law because the Legislature allowed "any citizen of this state" to bring suit to obtain "injunctions, impose penalties, and otherwise enforce the purposes of . . .. [the Sunshine Law]." Tenn. Code Ann. § 8-44-106(a). "When a person is expressly authorized by statute or rule to bring a particular action, his or her right of action arises directly out of the statute, and he or she needs no title under the substantive law to authorize suit." 59 Am. Jur. 2d *Parties* § 22 (1987). *See Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998).

The defendants rely on our unreported case of *City of Hendersonville v. City of Goodlettsville*, No. 01A01-9401-CV-00014, 1994 WL 330404 (Tenn. Ct. App. July 13, 1994), in which we held that Tenn. Code Ann. § 8-44-106(a) does not dispense with the substantive standing requirements of our prior cases. 1994 WL 330404 at *4. We think, however, that our subsequent published opinion of *Zseltvay v. Metropolitan Government of Nashville*, 986 S.W.2d 581 (Tenn. Ct. App. 1998) overruled *City of Hendersonville* sub silento. In *Zseltvay* we found specifically that the plaintiff lacked standing to challenge the action of the Metropolitan Council in purchasing a parcel of property. But we held that the plaintiff, as a citizen of the state, had standing to assert that the Board of Parks and Recreation had violated the Open Meetings Act. We said, "[w]e agree with the appellant that strict compliance with the Act is a necessity if it is to be effective . . .." 986 S.W.2d at 585. Our decision in *Zseltvay* was an affirmation of our earlier decision in *MARTA v. Metro. Gov't*, 842 S.W.2d 611 (Tenn. Ct. App. 1992), where we said that because the Sunshine Law is remedial, it should "be construed broadly to promote openness and accountability in government." 842 S.W.2d at 616. We believe that where the statute says "any citizen" may bring suit to enforce the Sunshine Law, the General Assembly must be taken at its word.

It seems to us that all the plaintiffs qualify as citizens for the purpose of Tenn. Code Ann. § 8-44-106(a). Therefore they have standing to bring suit for violations of the Sunshine Law.

## IV.
### Does the Sunshine Law Apply to the General Assembly?

Having decided that the plaintiffs have standing to raise the issue, we must now decide on the merits if the Sunshine Law applies to the General Assembly and to its committees. The Act declares that "[a]ll meetings of any governing body are declared to be public meetings open to the

public at all times, except as provided by the Constitution of Tennessee." Tenn. Code Ann. § 8-44-102(a).  A "governing body" is defined as

> the members of any public body which consists of two (2) or more members, with the authority to make decisions for or recommendations to a public body on policy or administration and also means a community action agency which administers community action programs under the provisions of 42 U.S.C. § 2790 [repealed]. Any governing body so defined by this section shall remain so defined, notwithstanding the fact that such governing body may have designated itself as a negotiation committee for collective bargaining purposes, and strategy sessions of a governing body under such circumstances shall be open to the public at all times.

The Act does not specifically mention the General Assembly.  In fact it does not specifically mention any entity except a community action agency.  Our Supreme Court has given us some guidance in *Dorrier v. Dark*, 537 S.W.2d 888 (Tenn. 1976), where the Court said, "[I]t is clear that for the purposes of this Act, the Legislature intended to include any board, commission, agency authority, or any other body, by whatever name, whose origin and authority may be traced to state, city or county legislative action . . . ."  537 S.W.2d at 892.  The Supreme Court's list does not include the General Assembly because it is a creature of the Constitution, not of the Legislature itself.

A general principle of statutory construction tells us that the state is not bound by a statute unless the statute specifically mentions the state, or application to the state is necessarily implied. *Keeble v. City of Alcoa*, 319 S.W.2d 249 (Tenn. 1958); *Davidson County v. Harmon*, 292 S.W.2d 777 (Tenn. 1956).  The legislative history of the Sunshine Law does not indicate that the General Assembly had itself in mind when it passed the Act.  Speaking in opposition to the bill, Representative McWilliams based his opposition on the fact that the bill applied to local governments but could not apply to the House or Senate because of Article II, Section 22 of the Tennessee Constitution.  House Debates, Feb. 11, 1974, R. Vol. III, P. 258-259.  We cannot find any indication that the Legislature intended to bind itself to the provisions of the Sunshine Law, or that they subsequently acted as if they were bound by it.

Furthermore, we are of the opinion that even if the Legislature intended to bind itself when it passed the Sunshine Law, the act would not bind a subsequent General Assembly.  Article II, Section 12 of our Constitution provides as follows:

> Each house may determine the rules of its proceedings, punish its members for disorderly behavior, and with the concurrence of two-thirds, expel a member, but not a second time for the same offence; and shall have all other powers necessary for a branch of the Legislature of a free State.

As a general proposition, "[o]ne legislature cannot restrict the power of its successor, at least on general questions of policy, . . . ." 72 Am. Jur. 2d *States, Territories and Dependencies* § 40 (1974).

In *Daughtery v. State*, 20 S.W.2d 1042 (Tenn. 1929), the plaintiff challenged a statute on the ground that the Legislature did not comply with a state code section outlining the procedure to be followed when the Governor held a bill for more than five days without signing it. Because the Constitution provided in Article 3, Section 18 that a bill automatically became law if the governor held it for more than five days, the court said, "[E]ach successive General Assembly is a law unto itself in this regard. It is constitutional, and not statutory, prohibitions which bind the legislature. The creator is greater than its creations." 20 S.W.2d at 1043. Binding the Legislature with procedural rules passed by another General Assembly would violate Article II, Section 12's grant of the right to the Legislature to determine its own rules and Article II, Section 22's provision that each House has all the powers necessary for a branch of the Legislature of a free state.

## V.
### THE CONSTITUTIONAL REQUIREMENTS OF AN OPEN LEGISLATURE

The General Assembly has unlimited power of legislation, except so far as it is restrained, expressly or by necessary implication, by the Constitution of the United States and the Constitution of Tennessee. *Prescott v. Duncan*, 148 S.W. 229 (Tenn. 1912); *Motlow v. State*, 145 S.W. 177 (Tenn. 1912).

> In creating a legislative department and conferring upon it legislative power, the people (in the constitution) must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose.
>
> The constitution is therefore the supreme law of the land to our legislature.

(Emphasis in the original.) *Keith v. Funding Board*, 155 S.W. 142, 144 (Tenn. 1913).

Since only constitutional prohibitions bind the Legislature, *Daughtery v. State*, 20 S.W.2d 1042 (Tenn. 1929), we must examine the provisions of the state and federal constitutions with respect to this question.

### A. THE TENNESSEE CONSTITUTION

The Tennessee Declaration of Rights is set out in Article I of our Constitution. It includes the familiar rights of a free people that we often take for granted. These rights include in part: the freedom to worship as one chooses, Section 3; the right to trial by jury, Section 6; the right to be free from unreasonable searches and seizures, Section 7; the right to due process, Section 8; the right to be free from double jeopardy, Section 10; the right to open courts, Section 17; and the right to bear arms, Section 26. But the section relevant to this controversy is Section 19, and it reads as follows:

> That the printing press shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no

law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions, is one of the invaluable rights of man and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. But in prosecutions for the publication of papers investigating the official conduct of officers, or men in public capacity, the truth thereof may be given in evidence; and in all indictments for libel, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases.

As a reminder of the importance of the Declaration of Rights, Article XI, Section 16 of the Constitution declares that "everything in the bill of rights contained, is excepted out of the general powers of the government, and shall forever remain inviolate."

The Constitution then proceeds to describe the form of government adopted to represent the people, in whom Article I, Section 1 makes all power inherent, and who are free to alter, reform, or abolish the government as they may think proper. Article II, Sections 1 and 2 provide as follows:

> **Section 1**. The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial.

> **Section 2**. No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.

With respect to the legislative power, Article II, Section 3, vests the legislative authority of the state in a General Assembly, consisting of a Senate and a House of Representatives. After providing the qualifications for members of each House and the mode of election, the Constitution provides in Article II, Section 12:

> Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member, but not a second time for the same offence; and shall have all other powers necessary for a branch of the Legislature of a free State.

Then Article II, Sections 21 and 22 provide:

> **Section 21**. Each House shall keep a journal of its proceedings, and publish it, except such parts as the welfare of the state may require to be kept secret; . . . .

> **Section 22**. The doors of each House and of committees of the whole shall be kept open, unless when the business shall be such as ought to be kept secret.

### 1. DOES ARTICLE I, SECTION 19 CONFLICT WITH ARTICLE II, SECTIONS 21 AND 22?

The plaintiffs interpret Article I, Section 19 as a guarantee to the press of unrestricted free access to all legislative sessions, or its committee meetings. When met with the reference in Article II, Sections 21 and 22 to the business of the Legislature that ought to be kept secret, the plaintiffs argue that there is a hierarchy in the Constitution, and since Article I, Section 19 appears in the Declaration of Rights and is declared by Article XI, Section 16 to be forever inviolate, any question should be resolved in favor of open legislative meetings.

We think this argument overlooks our prior holdings that we must construe our Constitution as a whole to harmonize and give effect to each of its provisions. *Wolf v. Sundquist*, 955 S.W.2d 626, 630 (Tenn. Ct. App. 1997). But even if we accept the plaintiffs' argument, their argument assumes that the constitutional provisions are actually in conflict. To create the conflict, Article I, Section 19 has to be read as saying "the press has the right to attend all meetings of the Legislature." The section clearly does not say that, nor is that interpretation necessarily implied. The right preserved in Article I, Section 19 is the right of the people to use the printing press to examine the proceedings of the Legislature or any other branch of government. If the section means that legislative sessions have to be open to the press, then cabinet meetings and Supreme Court conferences would also be open. We know of no authority for that position.

Article IX, Section 7 of the 1790 Pennsylvania Constitution contains language nearly identical to that contained in Article I, Section 19 of our Constitution. None of the cases interpreting the Pennsylvania Constitution suggests that it required open meetings of the Legislature. More specifically, the cases suggest that the section was a guarantee of free speech and the right to write or print on any subject. In *Respublica v. Joseph Dennie*, 4 Yeates 267 (Pa. 1805), the Pennsylvania Supreme Court made this comment about the meaning of Article IX, Section 7:

> Thus it is evident, that legislative acts, or of any branch of the government, are open to public discussion; and every citizen may freely speak, write or print on any subject, but is accountable for the abuse of that privilege. There shall be no licenses of the press. Publish as you please in the first instance without control; but you are answerable both to the community and the individual, if you proceed to unwarrantable lengths.

We are confident that Article I, Section 19 of our Constitution restricts prior restraints on the publication and dissemination of materials critical of governmental actions. It does not provide a right of access to all legislative meetings.

## 2. DO THE COURTS HAVE ANY POWER TO REVIEW THE LEGISLATURE'S DECISION TO HOLD CLOSED SESSIONS?

The plaintiffs assert that even if the Legislature has a limited right to hold closed sessions under Article II, Section 22 , that right must be exercised sparingly and is subject to judicial review. We agree that the Constitution contemplates openness in legislative deliberations, but we hold that for at least two reasons the decision to hold closed sessions is non-reviewable by the courts.

### a. THE SEPARATION OF POWERS

As we have seen, Article II, Section 2 of our Constitution prohibits a person belonging to one of the three great departments of government from exercising the powers delegated to another department, except as the Constitution itself directs or permits. The courts may, of course, hold an act of the Legislature unconstitutional, *Town of South Carthage v. Barrett*, 840 S.W.2d 895 (Tenn. 1992), and in certain limited cases the courts may provide a remedy where the action (or inaction) of the executive or legislative branches deprive the people of their constitutional rights. In *Baker v. Carr*, 369 U.S. 186 (1962), the United States Supreme Court held that the Tennessee Legislature's refusal to re-apportion the state's legislative districts violated the equal protection provisions of the United States Constitution. In *Powell v. McCormack*, 395 U.S. 486 (1969), the same court held that the House of Representatives could not exclude a member who had been duly elected and possessed all the requirements of membership expressly prescribed in the Constitution.

However, these incursions are rare. Where the question presented and the relief sought are of the type that do not admit of judicial resolution, or if the issue presented is a purely "political question," the separation of powers provisions of our constitutions make it non-justiciable. *Id.* at 516, 517. In *Baker v. Carr*, the court discussed what makes a question non-justiciable:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217.

Judged by any of the criteria set out in the quoted excerpt from *Baker v. Carr*, the question of when to close sessions of the Legislature is a purely political question. There is a "textually demonstrable constitutional commitment" of this issue to the legislative department. Not only is it contained in the legislative article, but to hold that the court must judge when the legislative business

ought to be kept secret would greatly diminish the Legislature's granted power to make its own rules, and to exercise "all the powers necessary for a branch of the Legislature of a free State." Art. II, § 12.

In addition, we can see no "judicially discoverable and manageable standards" for deciding when the Legislature's business "ought to be kept secret." So far as we know, the Legislature as a whole has been closed only once, in the military emergency in 1861 at the time of the vote to secede from the Union. Doubtless there are those who would argue that on a question so important and so divisive the proceedings should have been open. We acknowledge that had that question been presented to us, it would have provoked an extended discussion. But by what standards would we have resolved the question? We think the Constitution gives the Legislature the sole right to make that decision.

"The power of the legislature is limited only by the Constitution . . . ." *Quinn v. Hester*, 186 S.W. 459, 460 (Tenn. 1916). "The legislature has unlimited power to act in its own sphere, except so far as restrained by the Constitution of the state and of the United States." *Bank of Commerce & Trust Co. v. Senter*, 260 S.W. 144, 146 (Tenn. 1924). When political questions must be decided, the courts are "the least co-equal" branch of the government. *Anderson County Quarterly Court v. Judges of the 28th Judicial Circuit*, 579 S.W.2d 875, 877 (1978). They are "expected to eschew the normal political process," *id.*, and "to lean over backward to avoid encroaching on the legislative branch's power." *Id.* at 878. To require the Legislature to satisfy the judiciary when the Legislature wishes to close its doors would continue an already advanced and dangerous trend of governing through the courts.

The plaintiffs rely on *Cole v. Colorado*, 673 P.2d 345 (Colo. 1983), which held that the state's Open Meetings Act required legislative caucus meetings to be open even though the Colorado Constitution had provisions similar to our Article II, Section 12 and Article II, Section 22. But, in *Cole,* the Open Meetings Act was enacted by a popular initiative and explicitly included the Legislature. The court held that the act became part of the rules of each House. Therefore, the Legislature had, by not amending the statute, decided that the business of legislative caucus meetings was not "such as ought to be kept secret."

We have noted how the Tennessee Open Meetings Act does not apply to the Legislature and how, even if it did, it would not, in our opinion, bind a subsequent General Assembly. Therefore, this case is not persuasive authority for the plaintiffs.

The people and the press are not helpless in this process. At this point Article I, Section 19 becomes a powerful tool in promoting an open government. If the Legislature abuses the power delegated to it in Article II, Section 22, the press is free to inform the people of the abuse. But the remedy must be in the court of public opinion and not in the judiciary.

## B. LEGISLATIVE IMMUNITY

Of all the immunities enjoyed by government officials the legislative immunity is perhaps the most sweeping and absolute. This shield arises under the Speech and Debate Clauses of the state and federal constitutions. Article II, Section 13 of the Tennessee Constitution provides:

> Senators and representatives shall, in all cases, except treason, felony, or breach of the peace, be privileged from arrest during the session of the General Assembly, and in going to and returning from the same; and for any speech or debate in either House, they shall not be questioned in any other place.

The words are almost identical to the second sentence in Article I, Section 6[1] of the United States Constitution. Therefore, the cases interpreting Article I, Section 6[1] are particularly helpful.

In *Gravel v. United States*, 408 U.S. 606 (1972), the United States Supreme Court held it "incontrovertible" that the Speech and Debate Clause in Article I, Section 6 protected a member of the Senate "from criminal or civil liability and from questioning elsewhere than in the senate, with respect to [his legislative actions]. 408 U.S. at 615. The Court said:

> The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate and deliberation without intimidation or threats from the Executive Branch. It thus protects members against prosecutions that directly impinge upon or threaten the legislative process. We have no doubt that Senator Gravel may not be made to answer – either in terms of questions or in terms of defending himself from prosecution – for the events that occurred at the sub-committee meeting.

*Id.* at 616.

In *Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975), the Court held that the Speech and Debate Clause extended the same immunity to congressmen from being sued for prospective relief or for damages. In *Powell v. McCarmack*, 395 U.S. 486 (1969), the Supreme Court held that the individual congressmen were properly dismissed because of the protection of the Speech and Debate Clause, but that the plaintiff could maintain the action and obtain a declaratory judgment against the House clerk, the doorkeeper, and the sergeant-at-arms. State courts have recognized that the Speech and Debate Clauses of their constitutions bar suits against individual legislators for declaratory or injunctive relief. *See Consumers Education and Protective Association v. Nolan*, 368 A.2d 675 (Pa. 1977)("[I]f it (the legislator's action) falls within the 'legitimate legislative sphere' . . . the action against the legislator calling it into question whether criminal or civil, must be dismissed.). Thus, we are convinced that under the Speech and Debate Clause of our Constitution, individual legislators are immune from any kind of suit, including criminal

prosecutions and suits for damages, injunctions, and declaratory judgments – so long as the legislator's act is part of the Legislature's deliberative process.[1]

In addition to the protection of the Speech and Debate Clause, legislators enjoy a common law immunity, which the United States Supreme Court has described in these terms:

We have also recognized that state legislators enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause, *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1952). In *Tenney*, we concluded that Congress did not intend § 1983 to abrogate the common-law immunity of state legislators. Although *Tenney* involved an action for damages under § 1983, its holding is equally applicable to § 1983 actions seeking declaratory or injunctive relief. In holding that § 1983 "does not create civil liability" for acts undertaken "in a field where legislators traditionally have power to act" . . . we did not distinguish between actions for damages and those for prospective relief. Indeed, we have recognized elsewhere that "a private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation." . . . Although the separation of powers doctrine justifies a broader privilege for Congressmen than for state legislators in criminal actions, we generally have equated the legislative immunity to which state legislatures are entitled under § 1983 to that accorded Congressmen under the Constitution.

*Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 732 (1980).

Therefore, a legislator's immunity from suit when performing his or her legislative duties prevents the courts from making the Legislature justify its decision to hold closed sessions.

## B. THE UNITED STATES CONSTITUTION

The plaintiffs also allege that the Legislature's act of closing its committee meetings violates the free speech and free press provisions of the First Amendment to the United States Constitution and the due process provisions of the Fifth and Fourteenth Amendments.

---

[1] This immunity does not, of course, apply to the Attorney General, the Comptroller or the Treasurer, but despite being named as parties, no separate relief is sought against these defendants and there are no allegations of their wrongdoing. Presumably they were joined for the purpose of injunctive relief against enforcement of the revenue or appropriations bills. Since we have held that the Sunshine Law does not make these bills void, it is appropriate to dismiss these defendants also. We take no position on whether the General Assembly, the Senate or the House of Representatives, as separate bodies, could in a proper case be sued for prospective or declaratory relief.

# 1. THE FIRST AMENDMENT

As pointed out by the appellants, there are no United States Supreme Court cases recognizing a First Amendment right of access to state legislative meetings.  However, the Supreme Court has recognized a First Amendment right of access to criminal trial proceedings even when not specifically provided for in the Constitution. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980).  This right of access was found only after the Court recognized the extensive history of such a right of access. *Id.*  The Supreme Court pointed out that the Bill of Rights was "enacted against the backdrop of the long history of trials being presumptively open." *Id.* at 575.  "In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees." *Id.* at 575.  The Supreme Court pointed out that the "right of access to places traditionally open to the public, as criminal trials have long been, may be seen as assured by the amalgam of the First Amendment guarantees of speech and press." *Id.* at 577.

Several years later, the United States Supreme Court further defined the guarantees of the First Amendment.  The Court pointed out that in dealing with the claim of First Amendment right of access to criminal proceedings, the Court has emphasized two complementary considerations: 1) whether the place and process at issue have historically been open to the press and general public and 2) whether public access plays a significant positive role in the functioning of the particular process in question. *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 8, 106 S.Ct. 2735 (1986); *see also Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996).  The Supreme Court then went on to hold that there is a qualified First Amendment right of access to preliminary hearings as conducted in California in light of the tradition of accessibility to these types of hearings and that public access to such hearings is essential to the proper functioning of the criminal justice system. *Id.* at 10-13.

There was, however, no common law right to attend meetings of other government bodies. *See Abood v. League of Women Voters of Alaska*, 743 P.2d 333, 340 (Alaska 1987) (citing *Society of Professional Journalists v. Secretary of Labor*, 616 F. Supp. 569, 572 (D. Utah 1985); John J. Watkins, *Open Meetings under the Arkansas Freedom of Information Act*, 38 Ark. L. Rev. 268 (1984); *Note, Open Meeting Statutes: The Press Fights for the "Right to Know"*, 75 Harv. L. Rev. 1199, 1203 (1962)).  Legislative debates were traditionally held in secret in England and this tradition was carried over into colonial America. *Society of Professional Journalists*, 616 F. Supp. at 572 (citing Watkins, *supra*, at 271).  This tradition "resulted in both the Continental Congress and the Constitutional Convention conducting their proceedings in secret."  616 F. Supp. at 572.  Although not constitutionally required, the United States Senate and House of Representatives have held their sessions in public on a regular basis since 1794 and 1812, respectively. *Id.*  However, the committee sessions have been routinely held open to the public only since the mid 1970's. *Id.*  Although a majority of states, if not all, have enacted some form of a Sunshine Law requiring select branches of the state governments to hold some of their meetings in public, we can find no instance where these acts were held to be constitutionally required, *see Abood*, 743 P.2d at 340.

Our history in Tennessee suggests that local legislative bodies did not historically feel the need to operate in public. In fact, as pointed out by the appellant, free access to local legislative bodies required state action to secure it, and sources indicate that in 1957 an earlier version of the Sunshine Law was met with strong opposition in the Legislature. *See* Richard L. Hollow & Rudolph L. Ennis, *Tennessee Sunshine: The People's Business Goes Public*, 42 Tenn. L. Rev. 527, 529 (1975). The Sunshine Law itself was not enacted until 1974.

Since the First Amendment was not adopted against a backdrop of a long history of legislative sessions being presumptively open, we cannot find that the plaintiffs had a First Amendment right of access to legislative meetings.

## 2. THE DUE PROCESS CLAUSE

We must next decide whether the Due Process Clause of the United States Constitution gives the plaintiffs a cause of action.[2] The Fourteenth Amendment to the United States Constitution provides that no state shall deprive any person of life, liberty or property without due process of law. U.S. Const. amend. XIV, § 1. Because the plaintiffs have not claimed a loss of life, we will confine our inquiry to whether they have been deprived of their liberty or property by the acts of the Legislature.

The United States Supreme Court has held that the liberty guaranteed by the Fourteenth Amendment "'denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge . . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.'" *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 2706-07 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626 (1923)). As we have noted, the right to liberty does not include the right to attend meetings of governmental bodies. Therefore the Legislature's acts did not deprive the plaintiffs of that right.

The Supreme Court has further held that the Fourteenth Amendment's procedural protection of property is a "safeguard of the security of interests that a person has already acquired in specific benefits. These interests - property interests - may take many forms." *Roth*, 408 U.S. at 576. "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* at 577. We can find no authority for the proposition that the public or the press has a property interest in attending all meetings of the Legislature. We have dealt with the interest created by Article II, Section 22 of our Constitution and how the egislature's decision to hold closed sessions does not present a justiciable question. Therefore, due process does not require notice and an opportunity to be heard before the Legislature makes that decision.

---

[2] The appellees contend that they were deprived of notice of the hearings and an opportunity to be heard. Accordingly, we will limit our discussion to the requisites of procedural due process. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701 (1972).

As we have found that the appellees were not deprived of their liberty or property by the Legislature's actions, there can be no claim for a denial of due process. This issue is without merit.

## VI.

We directed the parties to brief two other questions that were raised in the court below. Although our disposition of the case on the merits makes these questions moot, we will address them because they are capable of repetition and yet will evade review if not addressed by the courts. *LaRouche v. Crowell*, 709 S.W.2d 585 (Tenn. Ct. App. 1985).

### A. THE COURT'S APPOINTMENT OF A "LAW" EXPERT

In its August 8, 2000 order, the lower court indicated an intent to appoint a legal expert to testify at trial regarding constitutional law. In its August 10, 2000 order, the court said it was "contemplating appointing a constitutional law expert to testify in court . . . as to the remedies available to the court" if the plaintiffs prevailed on the merits. The court cited Rules 702 and 706 of the Tennessee Rules of Evidence as its authority. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 706 authorizes the court to appoint experts under certain circumstances.

We do not think the rules of evidence authorize a court to appoint an expert witness on questions of law. Rule 702 refers to the "trier of fact" and an expert's assistance in determining a "fact in issue." It is the duty of the court to determine the law. *Whitaker v. Pullen*, 22 Tenn. 466 (1842); *Wakefield v. Crawley*, 6 S.W.3d 442 (Tenn. 1999).

The court does, however, have the power to appoint an amicus curiae to aid and assist the court in reaching a proper resolution of pending questions and issues. *Ferguson v. Paycheck*, 672 S.W.2d 746 (Tenn. 1984); *Vanderbilt University v. Mitchell*, 36 S.W.2d 83 (1931). We do not think the difference between this power and what the trial judge did is just a matter of degree – which we would most likely ignore. The difference is a fundamental one, involving the court's inherent power (to appoint an amicus curiae) and the power granted by the Rules of Civil Procedure to obtain assistance with the court's fact-finding duties. The former is to be exercised in "rare and unusual" cases. *Ferguson*, 672 S.W.2d at 747. Expert fact witnesses may be employed more as a matter of course.

## B. Representative Briley's Status as Amicus Curiae

The trial court first granted Representative Briley, in his official capacity, the right to be a plaintiff in this action. Then the court on its own motion ruled that Representative Briley could not act as a plaintiff, but would be allowed to act as an amicus, file a brief, and "examine witnesses and fully participate in any hearing the court has in regard to this matter." This curious turn of events has not been appealed by any of the parties, including Representative Briley.

The appellants do argue that there is no authority for a single member of the General Assembly to participate in a lawsuit against the remaining members in this manner. But, Representative Briley is no longer operating as a member of the General Assembly but as a friend of the court. As we have pointed out, the court does have the power to appoint an amicus curiae. So, the question comes down to one of whether the proper role of an amicus includes examining witnesses and participating in the hearings as a party would. We hesitate to try to define the part an amicus plays in aiding the court. In general, "there must exist a necessity for the services of a member of the bar to serve the court in reaching a proper resolution of questions or issues presented and pending before the court." *Ferguson*, 672 S.W.2d at 747. Thus, the role of an amicus may include many duties – so long as these duties serve the interests of the court and not the interests of the litigants. *Id.* We find no error in the lower court's orders in this respect.

## VII.

We reverse the lower court's order overruling the motion to dismiss and enter an order here dismissing the complaint. The cause is remanded to the Circuit Court of Davidson County for any further proceedings that may be necessary. Tax the costs on appeal to the appellees.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.