# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 19, 2004 Session

## J.C. KING, ET AL. v. GATLINBURG SPORTSMAN'S CLUB, INC.

**Appeal from the Chancery Court for Sevier County**
**No. 00-5-182     Telford E. Forgety, Jr., Chancellor**

---

**No. M2002-02949-COA-R3-CV - Filed - July 20, 2004**

---

Lessors, who are descendants of the original lessor, filed suit against the Gatlinburg Sportsman's Club, Inc., to declare that the real estate lease had been breached by the Club due to its failure to build a clubhouse as required by the lease. The Club argued that it built a clubhouse that satisfied the lease for the lease did not contain specifications for the type or size of clubhouse. It further argued that it was not in breach for the lessors had extended the deadline indefinitely to build a more substantial clubhouse. The Club also argued that the lessors' claim was barred by the six-year statute of limitations, equitable estoppel, waiver and laches and that the lessors' violated the Club's right of first refusal to purchase the property by not selling the property as the decedent's will directed and for making transfers of partial interests in the property amongst the beneficiaries and descendants of the original lessor. The trial court ruled that the parties mutually suspended the deadline by which the Club was to build a clubhouse, that the Club failed to build a clubhouse, that the Club was in material breach and, therefore, the lease was terminated. We reverse in part finding that the parties did not mutually suspend the obligation or deadline to build a clubhouse, that the completion date for the clubhouse was June 30, 1990, and that the lessors did not file suit until May 5, 2000; therefore, the lessors are barred by the six-year statute of limitations. We affirm the trial court's ruling that the lessors did not violate the Club's right of first refusal to purchase the property, finding that the inter-family transfers did not violate the Club's right of first refusal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part and Reversed in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

John B. Waters III and Garrett P. Swartwood, Knoxville, Tennessee, for the appellant, Gatlinburg Sportsman's Club, Inc.

Cynthia Richardson Wyrick and James L. Gass, Sevierville, Tennessee, for the appellees, J. C. King, Roy King, Kathy Huskey, Peggy Roberts, Mary King, and Gail Reagan.

**OPINION**

This lease dispute pertains to an 80 acre tract of land formerly owned by N.C. King, which he leased to the Gatlinburg Sportsman's Club, Inc. (the "Club") in 1984.[1] The lease authorized the Club to use the property as a "sportsman's club" and any other legally permitted business. The various activities the members of the Club enjoyed included camping, fishing, target shooting, archery and trap and skeet shooting. The initial lease term was twenty years with an option to renew for another twenty years.

In 1985, N.C. King and the Club entered into an addendum which provided that the Club would make substantial improvements to the property, and if an offer to purchase the property was made, the Club would have the right to match the offer. If the Club purchased the property it would be given credit against the purchase price for the value of the improvements to the property. The addendum further provided that if the Club did not purchase the property and the property was sold, the lessor would reimburse the Club for 50% of the value of the improvements. The more substantial improvements to be built by the Club were a dam, lake and clubhouse. The Club agreed to build a dam and lake by October 31, 1986, and a clubhouse by June 30, 1990. The dam and lake were built and there is no dispute as to the dam or lake. The primary dispute pertains to the construction of a clubhouse.

Mr. King died in 1988. His will provided that the leased property was to be sold with the proceeds divided among five beneficiaries; however, the beneficiaries agreed among themselves to retain the property as co-tenants. As a result, N.C. King's wife, Mary King, and four of his children, J.C. King, Linda Reagan, Peggy Roberts, and Kathy Huskey, each inherited a one-fifth interest in the property. Later, Mary King transferred her one-fifth interest to one of the co-tenants, J.C. King. Linda Reagan later transferred her one-fifth interest to her brother Roy King by quitclaim deed. The present owners of the property are four of N.C. King's children, J.C. King, Roy King, Kathy Huskey and Peggy Roberts (Lessors).

Lessors filed this action against the Club in 2000 alleging that the Club breached the lease by failing to construct a clubhouse. In their complaint, Lessors sought a judgment declaring that the lease was null and void and that the club be enjoined from any further construction on the tract. The Club answered denying it was in breach because it had built a clubhouse. The Club further defended arguing that Lessors' claim was barred by the six-year statute of limitations, equitable estoppel, waiver, and laches.

By counterclaim and third-party complaint, the Club further asserted that Lessors along with Mary King and Gail Reagan, who had inherited an interest in the property but later transferred their interests, breached the lease by depriving the Club of it's right of first refusal to purchase the property.

---

[1]Mary King also signed the lease and addendum as lessor along with her husband, N.C. King; however, N.C. King was the sole owner of the property.

Following a lengthy trial, the trial court ruled that the Club had not constructed the clubhouse in compliance with the lease but it was not yet in default and therefore denied Lessors' request that the Club forfeit the property immediately. The trial court further ruled that the clubhouse must be constructed within one year of the trial court's order to avoid a default under the lease. Further, the trial court dismissed the counterclaim and third-party complaint, thereby denying the Club's claim for breach of the right of first refusal.

Four issues are presented for review. The first three pertain to Lessors' allegation that the Club breached the lease by failing to build a clubhouse as required by the addendum to the lease. The first is whether Lessors' cause of action for breach of the lease is barred by the six-year statute of limitations. The second is whether Lessors' cause of action is barred by the equitable defenses of laches, waiver and/or estoppel. The third is whether the Club satisfied the lease provision to build a clubhouse when it identified a modest structure as "the clubhouse." The fourth issue pertains to the Club's allegation that Lessors and two beneficiaries of N. C. King violated the Club's right of first refusal to purchase the property by not selling the property as directed in the will of N. C. King and thereafter by transferring ownership interests within the family.

Facts

The Club began making improvements to the property shortly after the 1985 addendum. In 1986, the Club began grading and excavation to build roads, the dam and lake, the various ranges and the skeet and trap shooting areas. At this time the Club also prepared a site for the clubhouse which included placing septic tanks and installing field lines.

While these efforts were under way, N.C. King, who was a member of the Club, participated in Club activities and took part in Club meetings. The grading contractor testified that N.C. King was present much of the time the grading work was being done. N.C. King's son, J.C. King, testified that his father was excited about the building of the lake and clubhouse and whenever he would visit his father, his father would want to visit the property.

The Club completed the dam and lake in 1986; however, other than working on the site and septic system, construction on the clubhouse had not begun.

Lloyd Lee, who served as the building committee chairman for the Club, testified that the Club did not commit to build any particular type of clubhouse and that N.C. King did not insist on a particular type of clubhouse. Further, Lee testified that the Club made no promises to N.C. King or his wife at anytime. J.C. King, testified that while no specifics were required for the clubhouse, the Club led his father to believe that the clubhouse would be "substantial."

In order to obtain a loan for the completion of the clubhouse and other projects, the Club prepared cost and revenue estimates and approached a local bank for financing. However, according to Lee, before a loan was obtained, changes with respect to state law concerning lotteries and games such as bingo made such games illegal. This change in the law had a significant impact on the

Club's ability to generate income from such events which had been expected to be a major source of income for the Club.

Lee testified that by 1987, the plan to build a clubhouse was abandoned and this was known by all Club members, including N.C. King.  Lee stated that members of the Club discussed with N.C. King that the Club was no longer in a position to take out a loan and build the clubhouse.  Lee further indicated that he was not aware of N.C. King voicing any objection to the Club's inability to build a clubhouse.  Lee, however, acknowledged that N.C. King did not expressly relieve the Club of the obligation to build the clubhouse.

The June 30, 1990 completion date for the clubhouse passed without the Club constructing a clubhouse. On May 16, 1991, an attorney for the Executrix of N.C. King's estate, Kathy Huskey, sent a letter to the Club advising that the clubhouse had not been completed as required under the lease and that the decedent's estate would not be responsible for the value of any improvements to the property.  Ms. Huskey testified that she along with J.C. King and Roy King visited the Club and saw a sign attached to a small shed-like building indicating it to be the Club's "clubhouse."  Ms. Huskey stated that she did not demand that the sign be taken down, nor did she demand that the Club leave the property or that the Club build another clubhouse.

In 1999, the Club and Lessors met to discuss the Club's proposal to build a "new" clubhouse. Danny Thomas, president of the Club at the time of the meeting, stated that his presentation of the building plan for the "new" clubhouse was cut short by Kathy Huskey's statement to the Club, "that's all fine and dandy, but we want you out." Thomas indicated that  Huskey's remarks were a "bombshell revelation" as the Club was not aware that Lessors were angry about anything. According to Thomas, Huskey further stated that Lessors thought the Club had breached the lease by not building the clubhouse years ago.

Standard of Review

An appellate court's review of a trial court's findings of fact is *de novo* upon the record of the trial court accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise.  Tenn. R. App. P. 13(d).  Unless there is an error of law, we must affirm the trial court's decision as long as the evidence does not preponderate against the findings. *Umstot v. Umstot*, 968 S.W.2d 819, 821 (Tenn. Ct. App. 1997).

The weight, faith and credit to be given to a witness' testimony lies with the trial judge in a non-jury case because the trial judge had an opportunity to observe the manner and demeanor of the witness during their testimony. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991); *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987).  There is no presumption of correctness with respect to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996) and Tenn. R. App. P. 13(d).

## The Clubhouse

The Club argues that Lessors' claim that the Club breached the lease is barred by the six- year statute of limitations because the completion date for the clubhouse was June 30, 1990, yet the civil action was not brought until May 5, 2000. The Club argues that the limitations period began to run at the time of the breach which allegedly occurred on June 30, 1990, the date the clubhouse was to be completed.

Lessors argue that the statute of limitations does not apply because of specific language in Paragraph 13 of the lease which provides:

> One or more waivers of any covenant or condition or agreement herein contained shall no [sic] be construed as a waiver of a further breach of the same covenant or condition or agreement, and the consent or approval by the Lessor to or of any act by the Lessee requiring Lessor's consent or approval shall not be deemed to waive or render unnecessary Lessors' consent or approval to any subsequent similar act by the Lessee.

Lessors assert this provision allowed them to waive certain terms or conditions without waiving the terms or conditions permanently. The Club counters that Paragraph 13 does not defeat the application of the statute of limitations because the provision addresses the defense of waiver which is distinct from the issue of whether the statute of limitations bars Lessors' claim of breach. Such a provision, the Club claims is not applicable to the one time requirement to build the clubhouse, but is instead applicable in a situation such as accepting a late rental payment, without waiving the timeliness of further rental payments.

The trial court found that the obligation to build the clubhouse was mutually suspended by the parties. The Club contends that the trial court erred by basing its ruling that the obligation was suspended on the informal relationship between the parties rather than on the fact that if a breach occurred, it occurred on June 30, 1990, the date specified for completion. Further, the Club argues that the trial court's ruling would allow Lessors to toll the statute of limitations simply by their failure to act.

Tenn. Code Ann. § 28-3-109 provides that actions for the use and occupation of land and for rent and actions on contracts not otherwise expressly provided for shall be commenced within six (6) years after the cause of action accrued.

Lessors' complaint in this action seeks a declaration that the lease is null and void because the Club did not construct the clubhouse in accordance with the lease. The gravamen of the complaint determines the proper statute of limitations and this determination is made by assessing the type of injuries claimed and the damages sought. *Mackey v. Judy's Foods, Inc.*, 654 F.Supp. 1465, 1471 (M.D. Tenn. 1987). The form of relief here is governed by the six-year statute of limitations.

Statutes of limitation prescribe the time, after which no action at law or equity can be maintained. 18 *Tenn. Juris.*, Limitation of Actions, § 2. Such statutes are looked on with favor by the courts. *Applewhite v. Memphis State Univ.*, 495 S.W.2d 190, 195 (Tenn. 1973). In *Wood v. Carpenter* the United States Supreme Court stated:

> Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and antidote go together.

101 U.S. 135, 139, 25 L. Ed. 807, 808 (1879).

It is clear under Tennessee law that the statute of limitations begins running as to a contract when the cause of action accrues. *Collins v. Summers Hardware and Supply Co.*, 88 S.W. 3d 192, 197 (Tenn. Ct. App. 2002). Breach of a contract gives rise to a cause of action by the party that is aggrieved, and the statute of limitations begins to run as of the date of the breach. *Church of Christ Home for Aged, Inc. v. Nashville Trust Co.*, 202 S.W. 2d 178, 183 (Tenn. 1947). Also, a cause of action arises when a party's acts and conduct evince an intention to no longer be bound by the contract. *Id.* at 183. Abandonment, repudiation, or other breach of a contract, gives rise to and creates the occasion for, an action on the contract. *Gillespie v. Broadway National Bank*, 68 S.W. 2d 479, 482 (Tenn. 1934).

In this case, the Club and N.C. King enjoyed a relationship that extended beyond one of merely landlord and tenant with N.C. King being a Club member himself and participating in the Club's activities. While such a relationship could lead to a course of dealing and conduct in which the obligation to build the clubhouse was suspended, our review of the record does not show that the obligation was ever suspended by N.C. King. No written evidence that the obligation was suspended is found in the record, and while Lloyd Lee testified that he informed N.C. King that the Club could not afford to build the clubhouse, Mr. Lee clarified that N.C. King did not specifically relieve the Club from the obligation. Testimony indicates that the N.C. King was not upset or pushy about the Club's lack of progress with the clubhouse; however, it is relevant to note that N.C. King died on December 25, 1988 and the deadline for building the clubhouse was not until June 30, 1990. N.C. King's attitude may, or may not, have been different if the deadline was closer in time or had already passed.

The Club had been vigilant to protect its interests and this vigilance drove the Club to seek the addendum to the lease. Given this vigilance, and the cost of the clubhouse and its significance to the Club and N.C. King, it would seem that if there was a suspension of the obligation or an extension of time to build the clubhouse such would have been documented in writing, yet there is

no written agreement to suspend the obligation or extend the time period for completion. Furthermore, Mr. Lee indicated that N.C. King did not specifically waive the obligation and no one has testified that the deadline was extended to some future time. Moreover, the Club's action in placing the sign on the door of the shed-like structure, identifying it as the clubhouse, is inconsistent with an extension of the deadline or suspension of the obligation to build the clubhouse. Accordingly, we find the Club's actions inconsistent with the finding that the obligation was suspended.

While N.C. King's relationship with the Club may have been close and informal, the relationship with N.C. King's beneficiaries was not. Kathy Huskey testified that the family would have liked to have enjoyed the property as did the members and visitors to the Club, but that the family was never able to do so because they did not feel welcome. Similarly, J. C. King testified that the Club did not welcome the King family onto the property.

Ms. Huskey testified that she was aware of the June 30, 1990 completion date for the clubhouse and was aware that the Club had not built the clubhouse. Around 1991, Lessors were aware that the Club had not met its obligation to build the clubhouse and that the Club was identifying the shed-like structure as the clubhouse. Ms. Huskey recounted a discussion she had with Mike Stevenson who was president of the Club during this time period:

> Q. Have you had any conversations with Mike Stevenson about the clubhouse in particular?
> A. Yes.
> Q. Tell me about that.
> A. Well, he made the comment back in 1990 when I asked him why it hadn't been built, he made the comment that they didn't have the money for it. And I told, I said, well, you understand that everybody's going to be upset if you all don't do something. And that's when he said they could hang a sign on anything they wanted to and call it a clubhouse. And that's when the sign went up on the little shed.

Huskey also testified about a conversation with Shelia Valentine, a Club member,[2] in 1990 or 1991:

> Q. What about Sheila Valentine? What did she say to you about the clubhouse -- or about a clubhouse?
> A. That they could hang a sign on anything they wanted to and call it a clubhouse. That's basically the only conversations that stand out in my mind.
> Q. So, was it Mr. Stevenson's position that the Club did not have to build any particular structure as a clubhouse under the terms of the lease and addendum?
> A. I guess.

---

[2] The record is unclear as to whether Ms. Valentine was an officer of the Club.

Q.      And that's what Ms. Valentine said too, right?
A.      Yes.

Also, in May of 1991, Ms. Huskey's attorney sent a letter to the Club informing the Club that it had not built the clubhouse as required and that the family would not be responsible for any further improvements on the property.  The letter however did not indicate that the Club was in default for failing to build the clubhouse, but did state that the Club may be in default if it continued to make late payments.  At trial, Danny Thomas who served as president of the Club in 1999, indicated that he never saw the letter. Further, Thomas testified that he asked other members whether they had seen the letter or heard about it, and reported that no one had.  Mr. Thomas further stated that the letter was not sent to the Club's post office box where it received mail, but instead to the physical location of the Club where it did not receive mail.

Regardless of whether the letter was received by the Club, Ms. Huskey admitted that she did nothing to follow-up on the letter or the Club's failure to build the clubhouse:

Q.      You never did follow up on this letter, did you?
A.      No.
Q.      Never did do anything?
A.      No.
Q.      Never did send the Club any other notices, or anything like that?
A.      No.
Q.      In fact, you let it ride then for really for another eight years or so - -
A.      Yes.
Q.      – until you met with the Club at Danny Blalock's office [1999]; is that right?
A.      Uh-huh.
Q.      Never did take any efforts to enforce whatever rights you might have under the lease; right?
A.      Right
Q.      Continued to accept rent during all that time?
A.      Yes, when I could get it.

It is evident that the Club failed to build the substantial clubhouse contemplated by N. C. King and Lessors.  Moreover, at least one of the Club's officers openly challenged Lessors' assertion that the Club had a duty to build a substantial clubhouse by stating, in essence, that the Club could identify whatever structure it wanted as "the clubhouse" and that is exactly what the Club did. Indeed, despite having actual knowledge that the Club was refusing to build a "substantial" clubhouse, and taking the position that the Club was in breach of the addendum by failing to build a more substantial clubhouse, Lessors did not file their action until May 5, 2000, nearly ten (10) years after the alleged breach.

Having determined that the statute of limitation for Lessors' action is six years, and finding that more than six years transpired following the alleged breach before the action was filed, we

therefore conclude that Lessors' cause of action for breach due to the Club's failure to build a clubhouse is time barred.

Since we have concluded that Lessors' cause of action is barred by the statute of limitations, it is not necessary to address the Club's affirmative defenses of laches, waiver, and estoppel, or whether the Club was in default for not building a more substantial clubhouse, for these issues are moot.

Right of First Refusal

The Club's final issue is whether Lessors breached the Club's right of first refusal in the Addendum. This challenge is based upon two theories, the first of which is that Club's right of first refusal was violated because N.C. King's will directed the executrix to sell the land leased by the Club at public sale; yet, instead of selling the property in accordance with the will, the beneficiaries entered into an agreement to hold the property as tenants in common.[3] The Club does not cite any authority to support this contention and we are unaware of any authority that supports such a contention. Moreover, the Club does not cite any authority and we are unable to ascertain how the Club would have standing, as a mere tenant of leased property who or which is not an heir, beneficiary or creditor of the decedent, to challenge the distribution of bequests and/or devises under the decedent's will absent a contractual right to do so.

Standing is a judicial doctrine that limits court access to those who have a justiciable claim. These are claims in which the law recognizes a remedy and parties who have a real interest in that remedy. *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn.1976). This doctrine is based on the concept that "'[a] court may and properly should refuse to entertain an action at the [insistence] of one whose rights have not been invaded or infringed.'" *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001) (quoting 59 Am.Jur.2d Parties § 30 (1987)). In order for a party to show that he has standing, he must demonstrate "a distinct and palpable injury," a causal connection between the injury and the challenged conduct, and a remedy available to address the injury. *In re Youngblood*, 895 S.W.2d 322, 326 (Tenn.1995); *Metro. Air Research Testing Auth., Inc. v. Metro. Gov't of Nashville,* 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992).

---

[3]The pertinent part of N.C. King's will the Club relies on provides: After fulfillment of the preceding paragraphs of this Will, I hereby direct that the rest, residue and remainder of my estate, whether the same be real, personal or mixed property to be sold by my Executrix, hereinafter named, at public sale, upon such terms as she may deem feasible and practicable, as soon after my death as she shall deem proper, and from said sale I hereby give, devise and bequeath the proceeds therefrom as follows:

      A.      To my beloved wife, Mary Mott King, 1/5 thereof;
      B.      To my son, J.C. King, 1/5 thereof;
      C.      To my daughter, Linda Gail Reagan, 1/5 thereof;
      D.      To my daughter, Peggy Sue Roberts, 1/5 thereof; and
      E.      To my daughter, Kathy Marie Huskey, 1/5 thereof.

Here, the Club is attempting to do indirectly that which it did not do directly – challenge the administration of the estate of N. C. King. Moreover, the Club's right of first refusal is subject to a condition precedent, Lessor receiving "a bona fide offer to purchase said property." Ironically, the Club's complaint is that the premises[4] was not offered for sale and that a bona fide offer was not received. Neither the lease nor the addendum afford the Club the right to force Lessors to offer the premises for sale or to solicit bona fide offers. Accordingly, we find no merit to the Club's challenge of the decision of the executrix and beneficiaries to not sell the premises and/or to not seek bona fide offers.

The second basis of the Club's contention that Lessors breached the Club's right of first refusal is that Mary King and Gail Reagan transferred their respective one-fifth interests without affording the Club the right of first refusal. Mary King transferred her one-fifth interest to her brother J.C. King by general warranty deed. Gail Reagan transferred her one-fifth interest to her brother Roy King by quitclaim deed.

The pertinent part of N.C. King's will the Club relies on states, "I hereby direct that the rest, residue and remainder of my estate, . . . to be sold by my Executrix, . . . at public sale, upon such terms as she may deem feasible and practicable, as soon after my death as she shall deem proper" with the proceeds to go to Mary Mott King, J.C. King, Linda Gail Reagan, Peggy Sue Roberts, and Kathy Marie Huskey, in equal shares.

The lease describes the leased property as "the demised premises." The addendum similarly describes the leased tract as "the premises." The pertinent part of the addendum provides:

> 4. Lessor agrees that in the event Lessor decides to sell the premises subject to the leasehold interest, said sale would be subject to Lessee's leasehold interest therein. Lessor further agrees that in the event Lessor receives a bona fide offer to purchase said property, Lessor will offer said property to Lessee at the price of the offer. At such time the parties to this agreement shall employ the services of 3 independent, qualified appraisers who shall appraise the value of the improvements which lessee has added to the property, as well as the enhancement of value which the existence of said improvements shall have made to the property.

The trial court found that Mary King's transfer of her one-fifth interest to J.C. King did not trigger the right of first refusal, citing *Koella v. McHargue*, 976 S.W.2d 658 (Tenn. App. 1998) as controlling on this issue. In *Koella*, the court found that a transfer between co-tenants did not trigger a right of first refusal. *Id.* at 660.

Our duty is to construe the lease and addendum from the four corners of the documents. The addendum begins with the provision, "in the event Lessor decides to sell the premises subject to the

[4]The lease and addendum describe the leased property as "the demised premises" and "the premises."

-10-

leasehold interest, . . ." It then provides, "in the event Lessor receives a bona fide offer to purchase said property, . . ." It further provides that in such event(s), the parties shall employ appraisers to value the improvements and the enhancement of value made to the property. Reading these provisions together, it is apparent that the parties intended for the right of refusal to apply when Lessors offered the premises for sale, meaning the entire premises, and/or when Lessor received a bona fide offer to purchase the premises, meaning the entire premises, not a co-tenant's interest. Construing the intent of the parties as stated in the lease and the addendum, we find that the transfer by Mary King and Gail Reagan of their respective one-fifth interests to other beneficiaries did not activate the right of first refusal provisions under paragraph 4 of the addendum and therefore did not violate said provisions.

The Club also attacks the trial court's ruling that it would decline to enforce the right of first refusal based upon the doctrines of laches, estoppel, waiver and acquiescence because the transfers at issue had been a matter of public record since 1990. In that our ruling is based on the fact that the transfers only involved transfers of partial interests and that the rationale of the *Koella* cases applies to these transfers, we do not find it necessary to evaluate this aspect of the trial court's ruling.

Costs of appeal are assessed against the appellees, J. C. King, Roy King, Kathy Huskey and Peggy Roberts.

_____
FRANK G. CLEMENT, JR., JUDGE