IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 4, 2019 Session

## 150 4TH AVE N. TENANT, LLC DBA WEWORK v. THE METROPOLITAN NASHVILLE BOARD OF ZONING APPEALS ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 17-1287-I       Claudia Bonnyman, Chancellor**

_____

**No. M2019-00732-COA-R3-CV**

_____

This dispute arose from the issuance of a skyline sign permit to a high-rise office-building tenant. The permit allowed the tenant to erect two 495-square-foot signs on the building's northwest and southeast facades. Another tenant with skyline signs on the northeast and southwest facades appealed the issuance of the permit by filing an application with the Board of Zoning Appeals ("BZA") for interpretation against the zoning administrator. The complaining tenant contended, *inter alia*, that its brand was harmed because the juxtaposition of the new and existing signs would blur the relationship between the two tenants and asserted that the new signs caused the building to exceed the maximum signage permitted under the zoning code. The BZA determined that the new signs violated the zoning code and revoked the permit. On a Petition for Writ of Certiorari, the Davidson County Chancery Court held that the BZA erred by relying on a zoning map rather than the code's plain language and found the new signs complied with the code's requirements. This appeal followed. We have determined the complaining tenant failed to establish standing because it failed to demonstrate that it was aggrieved by the issuance of the permit. There is no competent evidence to show that the signs' juxtaposition would create public confusion about or signal a business relationship between the two tenants. Accordingly, the record fails to demonstrate that the complaining tenant's alleged injury "falls within the zone of interests protected or regulated by the [law] in question." *See City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 55–56 (Tenn. Ct. App. 2004). Further, based on the facts of this case, the BZA lacked the ability to provide meaningful redress. For these and other reasons, we affirm the trial court's judgment in part, albeit on different grounds, and remand with instructions for the trial court to order the BZA to dismiss the complaining tenant's application and to reinstate the new sign permit as issued in June of 2017. As for a separate issue that a neighboring homeowners' association attempted to raise during the BZA hearing—whether the northwest sign exceeded brightness standards—that issue was not properly before the BZA or the trial court. Thus, we reverse the trial court's decision to remand the brightness issue to the BZA.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in part, Reversed in part, and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD H. DINKINS, J., joined. W. NEAL MCBRAYER, J., filed a separate opinion in which he concurs in part and dissents in part.

Junaid Adetayo Odubeko and James L. Murphy, III, Nashville, Tennessee, for the appellant, Regions Bank Corp.

Douglas Berry and Robert F. Parsley, Nashville, Tennessee, for the appellee, 150 4th Ave N Tenant, LLC, d/b/a WeWork.

Lora Barkenbus Fox and Jonathan Barrett Cooper, Nashville, Tennessee, for the appellee, Board of Zoning Appeals of Nashville & Davidson Co.

**OPINION**

A.  Background

One Nashville Place, a.k.a., the "R2-D2 Building,"[1] enriched the Nashville skyline in 1985. The 25-story octagonal building sits in the heart of downtown Nashville on a lot that abuts Fourth Avenue North, Commerce Street, and the south end of Printers Alley.

In 2010, the Metropolitan Planning Commission codified a set of development standards for several sub-districts in downtown Nashville, including the area where One Nashville Place is located. *See* Zoning Code for Metropolitan Nashville and Davidson County § 17.37 ("Downtown Code"). Section V of the Downtown Code includes two design standards related to the width and area of "skyline" signs. First, a skyline sign

---

[1] When viewed from a distance, the architectural shape of the building resembles the iconic and loveable Droid named R2-D2, a character from "a galaxy far, far away" in the *Star Wars* franchise created by George Lucas. The creative design of R2-D2 was influenced by Akira Kurosawa's 1958 feature film *The Hidden Fortress*, particularly Tahei and Matashichi, the two comic relief characters that serve as sidekicks to General Makabe. *See* https://en.wikipedia.org/wiki/R2-D2. Legend has it that the name R2-D2 derives from when Lucas was making one of his earlier films, *American Graffiti*. *Id*. Sound editor Walter Murch states that he is responsible for the utterance that sparked the name for the droid. *Id*. Murch asked for Reel 2, Dialog Track 2, in the abbreviated form "R-2-D-2." *Id*. Lucas, who was in the room and had dozed off while working on the script for Star Wars, momentarily woke when he heard the request and, after asking for clarification, stated that it was a "great name" before going back to writing his script. *Id*. (citations omitted).

cannot exceed 60% of the building width. *Id*. § V, at 117. Second, the maximum area of all skyline signs on a building is determined by the number and type of abutting streets. *Id*. 109, 117.

In 2013, Regions Bank Corp. ("Regions") moved its headquarters to One Nashville Place. Shortly thereafter, Regions applied for and obtained a permit to install two 495-square-foot skyline signs, one on the northeast facade and one on the southwest facade. The Regions signs were installed, and they remain on the building to this day.

In January 2017, 150 4th Ave N Tenant, LLC, a workspace provider doing business as WeWork ("WeWork"), became a tenant of One Nashville Place. On February 12, 2017, WeWork applied for a permit to install two 45-foot-long skyline signs, one on the northwest facade and one on the southeast facade.

The Zoning Administrator for the Metropolitan Department of Codes initially denied the application based on a determination that the width of each sign exceeded 60% of the facade to which it was to be attached, and the sign needed the approval of the Downtown Code Design Review Committee ("the DRC") because of the sub-district where the building was located.[2] Thus, WeWork made the requisite application to the DRC. Following a review, the DRC construed the octagonal building as effectively having four longer facades rather than eight shorter ones and determined that the signs were within the 60% limit. Based upon the DRC's determinations and approval, the Zoning Administrator approved WeWork's application and issued the permit in June of 2017. WeWork completed the installation of the signs in August of 2017.

## B. Board of Zoning Appeals

Shortly after the WeWork signs were installed, Regions appealed the issuance of the permit by filing an application with the BZA for interpretation against the Zoning Administrator. Regions asserted that WeWork's signs would damage Regions' brand and, when combined with Regions' signs, exceed the maximum area permitted by the Downtown Code:

> [T]he juxtaposition of the existing Regions Signage and the approved WeWork Signage on the Subject Property will create public confusion

---

[2] In the event the approval of the signage design is required or a modification or variance from the applicable standards is needed, applicants must submit a request to the Planning Department and the Downtown Code DRC. *See* Downtown Code § I, at 14, and § V, at 104. When the subject property is within a "redevelopment district" designated by the Metropolitan Development and Housing Agency ("MDHA")—as in this case—the MDHA's Design Review Committee fulfills the role of the Downtown Code DRC. *Id*. § I, at 14.

about the relationship between Regions and WeWork. To the public, the Co-branding of the Subject Property with skyline signs of the same size will signal a business relationship between Regions and WeWork that, at best, would be misleading and, at worst, would be damaging to Regions' brand. In the worst case scenario, Regions' significant investment in its public brand would be diminished.

.   .   .

. . . . [T]he [Sign Standards] Map reveals that the portion of Printer's Alley abutting the Subject Property is <u>not</u> considered qualifying street frontage for purposes of calculating maximum allowable skyline signage. . . . [T]he maximum allowable skyline signage on the Subject Property is 1,440 square feet (720 square feet per Pedestrian Street multiplied by two qualifying Pedestrian Streets). . . .

The Regions Signage currently utilizes 990 of the permitted square feet, which means that only 450 square feet of additional skyline signage is available for future use at the Subject Property. As shown in the Permit, each of the WeWork signs is 45' by 11', or 495 square feet. Therefore, the WeWork Signage, as approved, will exceed the maximum allowable skyline signage at the Subject Property pursuant to Section V of the [Downtown Code].

At the BZA hearing on September 21, 2017, Regions clarified that its objection was "all about size," and it would not oppose one "slightly smaller" sign instead of two equally sized signs. Regions acknowledged that the Downtown Code's sign standards included a street type titled "Printers Alley" but relied on the Sign Standards Map, which identified only the portion of Printers Alley between Church Street and Commerce Street as the "Printers Alley" street type. The remainder of Printers Alley and every other alley in downtown was unlabeled.

In addition, the homeowners' association for the Viridian, a residential tower across the street from One Nashville Place, submitted a letter in support of Regions' appeal. Although the Viridian homeowners' association did not file an appeal or application for interpretation against the Zoning Administrator, several Viridian residents attended the hearing. The president of the homeowners' association advocated for the revocation of WeWork's permit, asserting the northwest sign exceeded the Downtown Code's brightness standards.

In response to the foregoing arguments, Calvin Lee, corporate counsel for WeWork, argued that the DRC had already determined that the signs complied with the Downtown Code. Mr. Lee engaged in the following colloquy with Board Chairman David Ewing and Vice Chairman David Taylor:

- 4 -

Mr. Lee: Well, [counsel for Regions] said that this is all about size and if that is the case then . . . this is not the venue or the forum to discuss that. The Design Review Committee was the authority that looked at that and—

Chairman Ewing: Let me stop you there because you went to law school, as I went to law school, and I said earlier it's kind of Marbury versus Madison. It's here, you're here, and you shouldn't assume that we don't have jurisdiction.

Mr. Lee: We understand. And we stand by the MDHA Review Committee's interpretation that this is a 4-sided building. I have their approval of our sign right here. It was conditioned that there are no other signs to be put up on that building. They're only allowing four signs because they are finding it as a four-sided building.

Mr. Taylor: I guess that the opposition, I don't think they're contesting that at all. They said, in terms of the percentage of facade that can be covered, they're saying that this is 60 percent. I mean they're not contesting that is what he said. So, their only argument to us was that it exceeds the maximum allowed square footage of signage for that building, which I think deals with Printer's Alley and whether that's a street or not. . . .

Mr. Lee: I understand. And the Design Review Committee considered that fact also, and we made a presentation at that meeting. And they decided that they accepted our argument that there were three streets to calculate the amount of signage on that building.

Mr. Taylor: I'm sorry, so what are you basing the three streets on? What is your argument on it being three streets?

Mr. Lee: I don't have that information in front of us. That was a presentation that our signage consultant and our designers sat with the Design Review Committee to work out. We know that we are new to your neighborhood and we don't want to be intrusive. We, in early December, reached out to the different planning departments here. We were working with Mr. Herbert's department very closely; they advised us

on the process; we went through the process in good faith. . . .

Chairman Ewing: Let's talk about the brightness. How many foot candles is that sign?

Mr. Lee: That I'm not sure as well.

.   .   .

You know, and so it's a little frustrating to not have an argument about the street, which is apparently what allows the building to have the amount of signage that it does. . . .

After the public hearing was closed, Board Member David Harper moved for the BZA to find that the Zoning Administrator erred by issuing the permit based on the square footage calculation:

Mr. Harper: [T]here's one specific piece in the Code that was in this presentation and it's a calculation, how much signage is allowed on a building? I don't care from where it's calculated or how you calculate what a facade is, what is in a facade, there's a total number and they're over it. And when that number was surpassed, that's when the error occurred. When that number added up to be more than the maximum number, an error occurred.

.   .   .

I will move that we find . . . that the Zoning Administrator did err in issuing the permit for the reasons I mentioned, the square footage calculations.[3]

The Board voted unanimously to revoke WeWork's sign permit.

In October 2017, the Board entered a formal order, finding "that the Zoning Administrator erred in [the] application of law with this issuance of the subject permit."

---

[3] Chairman Ewing also stated in his motion: "And I would like to add that it is also an error of the Downtown Sign Code with the brightness as it reflects to a close-by residential building."

C.  Chancery Court Decision

On December 1, 2017, WeWork timely filed a Petition for Writ of Certiorari in the Davidson County Chancery Court, arguing that the BZA erred, *inter alia*, by exceeding its jurisdiction and basing its interpretation solely on the "illustrative maps" in the Downtown Code.

After hearing argument from counsel for both WeWork and Regions, the trial court concluded that the Downtown Code unambiguously treated the entirety of Printers Alley as a street:

> The Court must find that the Board erred when it relied upon the color-coded map of the street types to determine the size of the skyline signs allowed on the property under the petitioner's permit. The map is in conflict with the text in the Downtown Code. Specifically, the text in Chapter 17.37 Section V, Sign Standards, Allocation by Street Type, allocates 720 square feet for the Printer's Alley type street. The text of the Downtown Code also states that Printer's Alley will not be treated as an ordinary alley, but will be treated differently, that is unconventionally. Neither the parties nor the Court found text in the Downtown Code which would remove part of Printer's Alley from serving as street frontage. Relying on unambiguous text in the Downtown Code at just this quoted section, Printer's Alley is treated as any other street frontage and it is treated as a whole in its entirety and not in parts.

> The Zoning Ordinance in Title 17 has its own rule of construction, which states that text shall prevail over illustrations. Metro Government anticipated that its numerous illustrations could on occasion cause conflict between the text of the Downtown Code and the numerous illustrations. Such a rule of construction is completely consistent with the common law rules of statutory interpretation, which recognize and help resolve ambiguity in the text, that is, the language of the statute or ordinance. Such an ambiguity is not present here, because the text is clear. The problem is caused by the illustration. Consequently, the property is allocated 2,160 square feet for skyline signage, because there's no dispute at all that the other two frontages, that is, Commerce Street and Fourth Avenue North are pedestrian street frontages and they each also get, are assigned or allocated, 720 square feet for the skyline signage.

Although it ruled in favor of WeWork on the square footage issue, the trial court found it necessary to remand to the Board the issue regarding the brightness of the northwest sign because the Board did not articulate which standard it relied on in determining that WeWork's northwest sign violated the brightness standards of the Downtown Code. This appeal followed.

STANDARD OF REVIEW

Judicial review of a decision by a board of zoning appeals "is limited to determining whether the board exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision." *Harding Acad. v. Metro. Gov't of Nashville & Davidson Cty.*, 222 S.W.3d 359, 363 (Tenn. 2007). "In proceedings involving a common law writ of certiorari, illegal, arbitrary, or fraudulent actions include: 1) the failure to follow the minimum standards of due process; 2) the misrepresentation or misapplication of legal standards; 3) basing a decision on ulterior motives; and 4) violating applicable constitutional standards." *Id*. Additionally, "[c]ourts must not 'reweigh the evidence' or 'scrutinize the intrinsic correctness of the decision,' but independently review the record to 'determine whether it contains "such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion."'" *Venture Holdings, LLC v. Metro. Gov't of Nashville & Davidson Cty.*, 585 S.W.3d 409, 417 (Tenn. Ct. App. 2019) (quoting *Gulley v. Robertson Cty. Planning & Zoning Comm'n*, No. M2015-00734-COA-R3-CV, 2016 WL 2898478, at *2 (Tenn. Ct. App. May 12, 2016)), *appeal denied* (Sept. 18, 2019). "If 'any possible reason' exists justifying the action, it will be upheld." *McCallen v. City of Memphis*, 786 S.W.2d 633, 641 (Tenn. 1990).

Under a codified version of this standard, we have recognized a three-step analysis:

> The court must first determine whether the agency has identified the appropriate legal principles applicable to the case. Then, the court must examine the agency's factual findings to determine whether they are supported by substantial and material evidence. Finally, the reviewing court must examine how the agency applied the law to the facts. This step is, of course, a highly judgmental process involving mixed questions of law and fact, and great deference must be accorded to the agency. At this stage, the court must determine whether a reasoning mind could reasonably have reached the conclusion reached by the agency, consistent with a proper application of the controlling legal principles.

*McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 820 (Tenn. Ct. App. 2005) (footnotes omitted) (citations omitted).

## ANALYSIS

The parties have raised several issues for our consideration, but we have determined the dispositive issue is whether Regions had standing to challenge the Zoning

Administrator's issuance of the sign permit to WeWork. We have also determined that the illumination issue purportedly presented by the Viridian homeowners' association was not properly before the BZA or the trial court.[4]

## I. STANDING

Both parties addressed this issue in their briefs. WeWork raised the issue in its Appellee's Brief, and Regions addressed the issue in its Reply Brief.[5] WeWork's position on this issue is stated as follows:

> The Court should reinstate WeWork's permit for another reason. Regions lacks standing to assert its challenge. Tenn. Code Ann. § 13-7-206(b) provides that "[a]ppeals to the board of [zoning] appeals may be taken by any person aggrieved . . . by any grant or refusal of a building permit or other act or decision of the building commissioner of the municipality or other administrative official. . . ." "The sort of distinct and palpable injury that will create standing must be an injury to a recognized legal right or interest. In many cases, this right or interest may be created or defined by statute." *City of Brentwood*, 149 S.W.3d at 56. That is so here. Because Regions "is seeking to vindicate a statutory right of interest, the doctrine of standing requires [Regions] to demonstrate that its claim falls within the zone of interests protected or regulated by the statute in question." Tenn. Code Ann. § 13-7-206(b).

For its part, Regions contends that WeWork's standing argument fails "because Tennessee law favors interpreting standing broadly in zoning cases, such as the instant matter." Also relying on this court's decision in *City of Brentwood*, 149 S.W.3d at 57, Regions notes that "the extension of authority to appeal and to seek judicial review to all persons who are 'aggrieved' reflects an intention to ease the strict application of the customary standing principles."

When a statute creates a cause of action and designates who may bring suit, standing is interwoven with subject matter jurisdiction and "becomes a jurisdictional

---

[4] Our determination pretermits all other issues raised by the parties.

[5] The Metropolitan Government filed a brief that states in its entirety: "The Metropolitan Government joins the Brief of Regions Bank, **particularly the portion crediting the BZA's treatment of Printer's Alley (a distinctive and unique street downtown)**. On this basis, Metro submits that the BZA's decision is supported by material evidence, was not arbitrary or capricious, and should be affirmed." (Emphasis added). Thus, it did not address nor take a position concerning the issue of standing.

prerequisite." *In re Estate of Smallman*, 398 S.W.3d 134, 149 (Tenn. 2013). "Subject matter jurisdiction concerns a court's 'lawful authority to adjudicate a controversy brought before it' and is conferred on a court by statute or the constitution." *Griffin v. Campbell Clinic, P.A.*, 439 S.W.3d 899, 902 (Tenn. 2014). The issue of subject matter jurisdiction "is non-waivable and must be considered by an appellate court." *In re Estate of Smallman*, 398 S.W.3d at 148. "The lack of subject matter jurisdiction is so fundamental that it requires dismissal whenever it is raised and demonstrated." *First Am. Trust Co. v. Franklin-Murray Dev. Co., L.P.*, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001).

Tennessee Code Annotated §§ 13-7-206(b) and 27-8-101, respectively, empower "aggrieved" persons to challenge the acts of zoning officials. Significantly, each statute uses the same standard for standing. Section 13-7-206(b) authorizes appeals by persons "aggrieved" by an act of a zoning official:

> Appeals to the board of appeals may be taken **by any person aggrieved** . . . by any grant or refusal of a building permit or other act or decision of the building commissioner of the municipality or other administrative official based in whole or part upon this ordinance enacted under this part and part 3 of this chapter.

(Emphasis added). Similarly, § 27-9-101 authorizes appeals by persons "aggrieved" by the final judgment of a board of zoning appeals:

> **Anyone who may be aggrieved** by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter.

(emphasis added); *see Fallin v. Knox Cty. Bd. of Comm'rs*, 656 S.W.2d 338, 342 (Tenn. 1983) (recognizing that a writ of certiorari under Tenn. Code Ann. § 27-9-101 is "the proper remedy for one who seeks to overturn the determination of a Board of Zoning Appeals").

"For the purposes of Tenn. Code Ann. § 27-9-101, to be 'aggrieved,' a party must be able to show a special interest in the agency's final decision or that it is subject to a special injury not common to the public generally." *Wood v. Metro. Nashville & Davidson Cty. Gov't*, 196 S.W.3d 152, 158 (Tenn. Ct. App. 2005).

In its application to the BZA, Regions asserted that the size and location of WeWork's signs would blur the relationship between Regions and WeWork and tarnish Regions' brand:

> As an active, longtime partner in Nashville's development, Regions is aggrieved by the approved issuance of the Permit authorizing the placement

of the WeWork Signage on the Subject Property. There is no relationship between Regions and WeWork besides being co-tenants at the Subject Property. However, the juxtaposition of the existing Regions Signage and the approved WeWork Signage on the Subject Property **will create public confusion about the relationship between Regions and WeWork**. To the public, the **co-branding** of the Subject Property with skyline signs of the same size will signal **a business relationship** between Regions and WeWork that, at best, **would be misleading** and, at worst, would be **damaging to Regions' brand**. In the worst case scenario, Regions' significant investment in its **public brand would be diminished**.

Regions maintains that it met the requirements of § 13-7-206(b) by alleging "injury to its brand resulting from the approval of the WeWork signs."

When interwoven with subject matter jurisdiction, standing is a constitutional issue. *See City of Memphis v. Hargett*, 414 S.W.3d 88, 98 n.8 (Tenn. 2013). Constitutional standing "is one of the 'irreducible . . . minimum' requirements that a party must meet in order to present a justiciable controversy." *Id*. at 98 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Establishing constitutional standing requires a plaintiff to satisfy three elements:

First, a party must show an injury that is "distinct and palpable"; injuries that are conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry are insufficient in this regard. [*Am. Civil Liberties Union of Tennessee v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006)]. Second, a party must demonstrate a causal connection between the alleged injury and the challenged conduct. *Id*. (citing *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001)). . . . The third and final element is that the injury must be capable of being redressed by a favorable decision of the court. *Id*.

*Id*. The plaintiff must establish these elements "by the same degree of evidence at each stage of litigation as other matters on which the plaintiff bears the burden of proof." *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767 (Tenn. Ct. App. 2002) (citing *Lujan*, 504 U.S. at 560). We have determined that Regions failed to satisfy its burden of proof on the first and third of these elements.

We shall first address whether Regions has shown an injury that is "distinct and palpable" and not predicated upon an interest it shares in common with the general citizenry. Indeed, brand dilution and tarnishment are recognized as legal injuries. *See* 15 U.S.C.A. § 1125(c). However, Regions presented no competent evidence that the public was likely to infer a relationship between it and WeWork or that such an inference was likely to harm the reputation of Regions' brand.

The presence of multiple brands on a single building is not unusual. *See, e.g.*, Downtown Code § V at 103 (requiring new developments submit a "common signage plan," which "regulates signage for multiple businesses or tenants within one building or complex"). The mere fact that Regions now shares the skyline of One Nashville Place with WeWork is insufficient to infer a likelihood of injury. Moreover, their signage is not on the same facade of the building.

As for the element of redress, the BZA's ability to provide meaningful redress is significantly limited based on the facts of this case. For example, the BZA does not have the discretion to deny the permit if WeWork's signage is within all permissible parameters of size and design under the Zoning Code. *See Harding Academy*, 222 S.W.3d at 363. This is because the "denial of a zoning permit which meets all the requirements of the ordinance when there is no valid ground for denial is arbitrary and unreasonable." *Id.* (quoting *Merritt v. Wilson County Bd. of Zoning Appeals*, 656 S.W.2d 846, 854 (Tenn. Ct. App. 1983)). This limitation becomes even more relevant considering that Regions stated it would not be opposed to one "slightly smaller" WeWork sign, instead of two signs, on the skyline of the building. Under Regions' interpretation of the Zoning Ordinance, WeWork would be entitled to at least 450 square feet of skyline signage—meaning WeWork could erect a skyline sign that is only 10% smaller than Regions' signs. Thus, we find it implausible that one 450 square-foot sign would be any less suggestive of a business relationship, and there is no competent proof in the record to the contrary.

Based on the foregoing, we find Regions lacked standing under Tenn. Code Ann. § 13-7-206(b) to challenge the Zoning Administrator's issuance of the sign permit to WeWork. Accordingly, Regions' appeal and application for interpretation against the Zoning Administrator to the BZA must be dismissed for lack of standing.

## II. THE BRIGHTNESS ISSUE

As noted earlier, the Viridian homeowners' association attended the hearing and requested the BZA to revoke WeWork's permit based on allegations that the brightness of the northwest sign adversely affected the homeowners' use of their residential property. For the reasons explained below, we have determined this issue was not properly before the BZA or the trial court.

The BZA's Rules of Procedure allow an appellant that files an appeal and application for interpretation against the Zoning Administrator's ruling to present its case, which includes presenting testimony from "witnesses in support of the application." R. 8(G). However, the appellant must have previously filed an appeal—that is, an application "on a form provided for that purpose by the Department of Codes Administration." R. 3(A). The Viridian homeowners' association did not file an appeal or application for interpretation against the Zoning Administrator regarding the brightness of WeWork's sign or any issue regarding WeWork's signs.

- 12 -

Moreover, Regions' only comment on the brightness issue came after the president of the Veridian homeowners' association addressed the BZA at the hearing. The relevant and very brief colloquy between Regions' counsel and the BZA Chairman on the brightness issue reads:

Mr. Murphy: Obviously, we're concerned about [brightness] as well, although it affects—my client is in the building so they don't have the brightness problem that the Viridian folks do. The Viridian folks really have the brightness impact more so than my client.

Chairman Ewing: So, your client, the bank, yeah, that's not as big a deal. Gotcha. But you still think that's an issue?

Mr. Murphy: Obviously, it is, because it's having an impact—it's too much signage and, in addition to being too much, it's also having an adverse impact on the surrounding neighborhood. So, I think those are both issues.

Whether the northwest sign exceeded the brightness standards was not properly before the BZA. Therefore, the BZA erred in considering the issue and erred in basing its ruling, at least in part, on the brightness of the sign. Because the issue was not properly before the BZA, it was not properly before trial court. Therefore, we reverse the trial court's decision to remand this issue back to the Board.

III. THE CONCURRING AND DISSENTING OPINION

In a separate opinion, our colleague concludes that Regions had standing to challenge the issuance of the sign permit to WeWork and would hold that the Metropolitan Board of Zoning Appeals acted arbitrarily and capriciously in revoking the WeWork sign permit. While we respectfully disagree with our colleague's determination that Regions had standing to challenge the permit issued to WeWork, we agree with his conclusion that

the Downtown Code is clear and that the Printers' Alley street type includes Printers' Alley, even that portion abutting One Nashville Place. *See id.* at 15. Although the "Map of Street Types for Signage Standards" could be seen as contradicting the text of the Downtown Code, the Zoning Code specifies that text controls over figures in the case "of any difference of meaning or implication." Zoning Code, Chapter 17.04.050(L) (Mar. 2015). The portion of Printers' Alley abutting One Nashville Place may not include businesses on the ground floor and upper floors, but the same is also true of other portions of Printers' Alley highlighted in green on the "Map of Street Types for Signage Standards." The character of that portion

of the alley does not justify ignoring the fact that it is named "Printers' Alley."

Thus, if Regions had standing, we would affirm the trial court's determination that the Metropolitan Board of Zoning Appeals acted arbitrarily and capriciously in revoking the WeWork sign permit and remand with instructions to reverse the decision by the BZA.

.

## IN CONCLUSION

The judgment of the trial court is affirmed in part,[6] reversed in part, and this matter is remanded with instructions for the trial court to order the BZA to dismiss Regions' appeal of and application for interpretation against the Zoning Administrator's issuance of the sign permit and reinstate the permit as issued to WeWork in June of 2017. Costs of appeal are assessed against Regions.

_____
FRANK G. CLEMENT JR., P.J., M.S.

---

[6] The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result. *Cont'l Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 789 (Tenn. Ct. App. 1999); *Allen v. Nat'l Bank of Newport*, 839 S.W.2d 763, 765 (Tenn. Ct. App. 1992); *Clark v. Metro. Gov't of Nashville & Davidson Cty.*, 827 S.W.2d 312, 317 (Tenn. Ct. App. 1991).